OLIVIA Y., By and Through Her Next Friend, James D. JOHNSON; Jamison, J., by and Through His Next Friend, Clara Lewis; Desiree, Renee, Tyson and Monique P., by and Through Their Next Friend, Sylvia Forster; John A., by and through His Next Friend, James D. Johnson; Cody B., by and through His Next Friend, Sharon Scott, Mary, Tom, Matthew and Dana W., by and Through Their Next Friend, Zeletra W.; and Sam H., by and Through His Next Friend, Yvette Bullock, on Their Own Behalf and on Behalf of Others Similarly Situated Plaintiffs

v.

Haley BARBOUR, as Governor of the State of Mississippi; Donald Taylor, as Executive Director of the Department of Human Services; and Billy Mangold, as Director of the Division of Family and Children's Services Defendants

No. CIV.A.3:04 CV 251LN.

United States District Court, S.D. Mississippi, Southern Division. Jackson Division.

Nov. 18, 2004.

Christian D. Carbone (PHV), Loeb & Loeb, LLP, New York, NY, W. Wayne Drinkwater, Jr., Bradley, Arant, Rose &

White, LLP, Jackson, Corene Kendrick (PHV), Children's Rights, Inc., Susan Lambiase(PHV), Children's Rights, Inc., John F. Lang (PHV), Loeb & Loeb, LLP, New York, NY, Stephen H. Leech, Jr., Jackson, Marcia Robinson Lowry(PHV), Children's Rights, Inc, Eric C. Manne(PHV), Loeb & Loeb, LLP, New York, NY, Melody I. McAnally, Bradley, Arant, Rose & White, LLP, Jackson, Shirim Nothenberg(PHV), Children's Rights, Inc., Eric E. Thompson(PHV), Children's Rights, Inc., New York, NY, for Plaintiffs or Petitioners.

Amy Kebert Elder, McGlinchey Stafford, Betty A. Mallett, McGlinchey Stafford, Harold Edward Pizzetta, III, Office of the Attorney General, Samuel E. Scott, McGlinchey Stafford, Jackson, for Defendants or Respondents.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, Chief Judge.

This cause is before the court on the motion of defendants Haley Barbour, Governor of the State of Mississippi, Donald Taylor, Executive Director of the Department of Human Services, and Billy Mangold, Director of the Division of Family and Children's Services, to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiffs have responded to the motion and the court, having considered the memoranda of authorities submitted by the parties, concludes that defendants' motion should be granted in part and denied in part, as set forth herein.

Plaintiffs have brought this civil rights action pursuant to 42 U.S.C. § 1983 on behalf of Mississippi's abused and neglected children seeking declaratory and injunctive relief to compel defendants Haley Barbour, as Governor of the State of Mississippi, Donald Taylor, as Executive Director of State Department of Human Services, and Billy Mangold, as Director of the Division of Family and Children's Services, to meet their legal obligations to care for and protect these children. The named plaintiffs herein are thirteen children who allege they are being harmed by the collapse of Mississippi's child welfare system and who seek to represent two classes of Mississippi children, consisting of (1) all children who are or will be in the legal and/or physical custody of the Division of Family and Children's Services (DFCS) (referred to herein as the "In–Custody Class") and (2) all of those children who are not in DFCS custody, but have been or are at risk of being abused or neglected, and about whom Defendants have received a report of abuse or neglect (referred to as the "Protective Services Class").

Generally speaking, plaintiffs allege that Mississippi's child welfare system has systematically failed to meet its legal obligation to protect and care for all of the State's abused and neglected children, all as a result of gross mismanagement and underfunding of Mississippi's overburdened child welfare system. Plaintiffs charge, among other things, that Mississippi's child welfare system lacks a minimally adequate number of caseworkers and suitable foster care placements. As a result, reports of abuse or neglect are often never investigated so that children are left to languish in potentially dangerous environments. Abused and neglected children are often left to suffer in dangerous homes without the provision of oversight or services to ensure their safety, even when there is clear indication that a child is being maltreated. In many cases, children are diverted from the foster care system by being shuffled off to relatives who are unsuitable or unable to provide adequate care, again with no oversight or

services provided to ensure their health and safety. In other cases, as a result of insufficient safe foster care placements, children are cycled through unsuitable foster care placements or institutions, where they are not regularly monitored. Plaintiffs charge that as a result of their failure to institute needed reforms to address and correct known and documented deficiencies in the system, defendants have condemned children to a child welfare system unable to meet their legal obligations to protect them. Plaintiffs thus bring causes of action against defendants under § 1983 for violation of their alleged procedural and substantive due process rights, of their rights to equal protection and their alleged rights under the Adoption Assistance and Child Welfare Act. Defendants maintain in their motion that each of these claims is due to be dismissed for failure to state a claim upon which relief can be granted. The court addresses plaintiffs' claims, and defendants' motion as it relates to them, seriatim.

*Procedural Due Process:*

■ The Protective Services Class claims a constitutionally protected interest "in having credible reports of maltreatment referred to Youth Court, as required by state law, and having the Youth Court make the final determination regarding the disposition of those reports." In their motion, defendants argue that these plaintiffs have no sustainable procedural due process claim because the state statute upon which they rely as the basis for their claimed interest merely prescribes *procedures* for investigating and referring reports of abuse and neglect and does not dictate a specific substantive outcome and hence does not create a constitutionally protected interest.

The principles upon which defendants' motion on this point is grounded were summarized by the court in *Tony L. By*

*and Through Simpson v. Childers,* as follows:

> State-created liberty interests arise when a state places "substantive limitations on official discretion." *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983); *Kentucky Dep't of Corrections,* 490 U.S. at 462, 109 S.Ct. at 1909–10[, 104 L.Ed.2d 506 (1989)]. A state substantively limits official discretion "by establishing 'substantive predicates' to govern official decisionmaking ... and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met." *Id.* (citation omitted). The state statutes or regulations in question also must use "explicitly mandatory language" requiring a particular outcome if the articulated substantive predicates are present. *Id.* at 463, 109 S.Ct. at 1910.... Finally, the statute or regulation must require a particular substantive outcome. State-created procedural rights that do not guarantee a particular substantive outcome are not protected by the Fourteenth Amendment, even where such procedural rights are mandatory. *Pusey v. City of Youngstown,* 11 F.3d 652, 656 (6th Cir. 1993) (holding that victim impact law, requiring prosecutor to give notice of trial or guilty plea entry to victim, does not create an interest protected by the Due Process Clause because it only creates expectation of process and not expectation of a particular substantive result), *cert. denied,* 512 U.S. 1237, 114 S.Ct. 2742, 129 L.Ed.2d 862 (1994).

71 F.3d 1182, 1185 (6th Cir.1995). The statute at issue in *Tony L.* provided that

> [u]pon receipt of a report of an abused, neglected or dependent child pursuant to this chapter, the cabinet as the designated agency or its delegated representative shall initiate a prompt investi-

gation, take necessary action and shall offer protective services toward safeguarding the welfare of the child.

*Id.* (citation omitted). The court agreed with the plaintiffs not only that the language of the statute was "undoubtedly mandatory," but that it "mandate[d] action based upon substantive predicates." *Id.* at 1186. The court nonetheless concluded that the plaintiffs' claim of a state-created liberty interest failed "because no particular substantive outcome was mandated." *Id.* Rather, "[t]he requirement that an investigation be initiated only [gave] plaintiffs an expectation of receiving a certain process." *Id.* (citing *Pusey,* 11 F.3d at 656). And while the statute did require that the investigating agency take "necessary action" and to offer "protective services," it did not define these terms or set forth options available to the investigating agency:

> It [did] not explain, for example, whether the Cabinet should take the child from the home, provide the parent with counseling, or simply monitor the family situation on a regular basis. Each of these actions, and a myriad other possibilities, appear[ed] to be a reasonable

response to a report of child abuse. Yet, the Unified Juvenile Code does not specifically require the Cabinet to take any one of them. An expectation that some sort of action will be taken is not enough. Rather, a plaintiff must have an expectation that a particular result will follow from a particular, required action. This statute simply does not provide Plaintiffs with such an expectation.

*Id.* at 1186. *See also Doe by Nelson v. Milwaukee County,* 903 F.2d 499, 503 (7th Cir.1990)(holding that plaintiffs possessed no property interest in having the state's Department of Social Services undertake an investigation of a child abuse report because the statutes in question merely established "a set of procedures that guides Wisconsin counties in their efforts to prevent child abuse," and stating that while "[u]narguably, these procedures assist the county in conferring the benefit of government protection upon Wisconsin's minor residents[,] ... the procedures themselves are not 'benefits' within the meaning of Fourteenth Amendment jurisprudence").[1]

---

1. In *Doe,* the court elaborated on the applicable due process principles, explaining:

> While "the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money," *Board of Regents v. Roth,* 408 U.S. 564, 571–72, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972), not every state or municipal law, regulation or ordinance creates a constitutionally protected entitlement. In resolving a claim based on procedural due process, we must be careful to distinguish the substantive right from the procedure designed to prevent its arbitrary deprivation. Justice Blackmun recently reiterated the importance of this distinction: "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an

interest without due process of law." *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990) (citing *Parratt v. Taylor,* 451 U.S. 527, 537, 101 S.Ct. 1908, 1913–14, 68 L.Ed.2d 420 (1981)).

> It is essential, therefore, to a proper analysis of a procedural due process claim ... that the court not confuse substance with process. One cannot have a "property interest" (or a life or liberty interest, for that matter) in mere procedures because

>> [p]rocess is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a claim of entitlement.... The State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the State does

In the case at bar, plaintiffs acknowledge that procedural due process inquiries hinge on whether an individual has a legitimate claim of entitlement to a specific outcome, but they submit that unlike the statute calling for an abuse investigation that was at issue in *Tony L.*, the Mississippi statutes upon which they rely do require a particular outcome, namely, that all reports of abuse or neglect be reviewed by a youth court judge for final adjudication. They note that their procedural due process claim is grounded on provisions of Mississippi's Youth Court Law which require, in general, that all reports of abuse and neglect received by defendants be referred to the youth court for what they term "final" review, and point, in particular, to Mississippi Code Annotated § 43–21–353, which provides that upon receipt by the DHS of a report of suspected child abuse or neglect, "immediately a referral shall be made by the Department of Human Services to the youth court intake unit, which unit shall promptly comply with Section 43–21–357."[2] Section 43–21–357, in turn, provides in relevant part that

[a]fter receiving a report, the youth court intake unit shall promptly make a preliminary inquiry to determine whether the interest of the child, other children in the same environment or the public requires the youth court to take further action. As part of the preliminary inquiry, the youth court intake unit may request or the youth court may order the Department of Human Services, the Department of Youth Services, any successor agency or any other qualified public employee to make an investigation or report concerning the child and any other children in the same environment, and present the findings thereof to the youth court intake unit. If the youth court intake unit receives a neglect or abuse report, the youth court intake unit shall immediately forward the complaint to the Department of Human Services to promptly make an investigation or report concerning the child and any other children in the same environment and promptly present the findings thereof to the youth court in-

not create an independent substantive right.

*Olim v. Wakinekona,* 461 U.S. 238, 250–51, 103 S.Ct. 1741, 1748–49, 75 L.Ed.2d 813 (1983); *Cain v. Larson,* 879 F.2d 1424, 1426 (7th Cir.) ("It is by now well-established that in order to demonstrate a property interest worthy of protection under the fourteenth amendment's due process clause, a party may not simply rely upon the procedural guarantees of state law or local ordinance."), *cert. denied,* 493 U.S. 992, 110 S.Ct. 540, 107 L.Ed.2d 537 (1989). Courts have observed the confusion that would result from elevating a state-mandated procedure to the status of a constitutionally protected property interest. *See, e.g., Cleveland Board of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1492–93, 84 L.Ed.2d 494 (1985) ("The categories of substance and process are distinct. Were the rule otherwise, the Clause would be reduced to a mere tautology."); *Shango v. Jurich,* 681 F.2d 1091, 1101 (7th Cir.1982)

("Constitutionalizing every state procedural right would stand any due process analysis on its head.").

*Doe by Nelson,* 903 F.2d at 502–03.

2. The statute goes on to provide that in the case of reports of certain types of abuse, such as reports "that a child has been sexually abused, or burned, tortured, mutilated or otherwise physically abused in such a manner as to cause serious bodily harm, or upon receiving any report of abuse that would be a felony under state or federal law, the Department of Human Services shall immediately notify the law enforcement agency in whose jurisdiction the abuse occurred and shall notify the appropriate prosecutor within forty-eight (48) hours, and the Department of Human Services shall have the duty to provide the law enforcement agency all the names and facts known at the time of the report...." Plaintiffs do not allege that the DHS has regularly or in specific instances failed to comply with this provision.

take unit. If it appears from the preliminary inquiry that the child or other children in the same environment are within the jurisdiction of the court, the youth court intake unit shall recommend to the youth court:

(a) That the youth court take no action;

(b) That an informal adjustment be made;

(c) The Department of Human Services, Division of Family and Children Services, monitor the child, family and other children in the same environment;

(d) That the child is warned or counseled informally; or

(e) That a petition be filed.

(2) The youth court shall then, without a hearing:

(a) Order that no action be taken;

(b) Order that an informal adjustment be made;

(c) Order that the Department of Human Services, Division of Family and Children Services, monitor the child, family and other children in the same environment;

(d) Order that the child is warned or counseled informally; or

(e) Order that a petition be filed.

(3) If the preliminary inquiry discloses that a child needs emergency medical treatment, the judge may order the necessary treatment.

Plaintiffs maintain that these statutes give them a constitutionally protected liberty interest in having all reports of abuse or neglect reported to the Youth Court, where they have the opportunity for judicial review of the children's situations and to have the court order DFCS to take necessary steps to protect them from further abuse and neglect. They submit that because of defendants' alleged willful decision to prevent the youth court from considering all abuse and neglect reports for final disposition, plaintiffs have been denied an outcome statutorily guaranteed to them, namely, their day in court. They insist that they are *not* alleging, as defendants argue, that they are entitled to the *process* of an investigation but rather are alleging that defendants are denying children who are subject of abuse and neglect reports the specific *outcome* of the right of access to the courts, which in turn, deprives them of the opportunity to have the court engage in an independent review of each case of abuse or neglect and to have the court order services if necessary to protect the child.

In the court's opinion, however, while the statutes at issue do contain certain mandatory procedures, they do not dictate a particular outcome. The only outcome of a referral by DHS to the youth court intake unit is a preliminary inquiry by the intake unit as to whether any action should be taken by the court; notably, the intake unit is simply a person or persons designated by the youth court to conduct investigations, which person or persons, in fact, may be an employee or employees of DHS.[3] Moreover, the nature or scope of the intake unit's preliminary inquiry is not defined by statute, nor is the intake unit directed by the statute or otherwise to

---

**3.** In accordance with Mississippi Code Annotated § 43–21–115, the judge in every youth court division is required to appoint "one or more persons to function as the intake unit for the youth court division," and places no limitation on who may be selected to serve as the "intake unit." Although opinions of the Mississippi Attorney General do not have the force of law, the court notes that the Attorney General's office has issued opinions confirming that "nothing in Section 43–21–115 ... would prohibit the designation of an employee or employees of MDHS from serving as the intake unit." *See Attorney General's Opinion,* 1998 WL 56478, *1 (Jan. 21, 1998).

take any particular action depending on the findings of its preliminary inquiry. In short, this court can find in the prescribed mechanism no protectable liberty interest, for the scheme at issue does not guarantee a specific substantive outcome.

*Equal Protection:*

■ Defendants maintain that they are entitled to summary judgment as to each of plaintiffs' equal protection claims—alleged as their second, third, fourth and seventh causes of action—on the basis that plaintiffs have not alleged that the challenged actions or decisions are the result of any discriminatory purpose. In their complaint, the Protective Services Class identify three ways in which defendants are alleged to be violating their equal protection rights, namely, that defendants violated their right to equal protection by "denying investigative services to protective services class members who are the subject of a report of abuse or neglect" while at the same time providing investigative services to other similarly situated children; by informally placing some abused children with relatives who are willing to care for them even though the relatives are not provided assistance payments and the children do not receive as much administrative and judicial supervision as children placed in foster care; and by denying child welfare services to children placed in "unlicensed facilities" despite the fact that they are otherwise similarly situated to children who are placed in DFCS custody and receive child welfare services.

In addition to these claims by the Protective Services Class, the In–Custody Class complains that some members of the class are being placed in unlicensed facilities and are thereby denied "protections of minimum licensing requirements, including adequate safety procedures and staffing," while otherwise similarly situated children are placed in licensed placements.

In short, plaintiffs charge that because of a critical shortage of funding, caseworkers and foster placements, defendants intentionally and arbitrarily turn abused and neglected children away from the system that is mandated to protect them, despite the fact that they are similarly situated to children who are provided foster care services and that defendants' failure to provide all similarly situated abused and neglected children with mandated child welfare services violates equal protection guarantees.

Defendants argue that plaintiffs have not alleged a viable equal protection claim in view of the absence of any allegation that the alleged disparate treatment of which they complain is the result of a discriminatory animus against a class of children which is identifiable by a preexisting characteristic, i.e., a class which is defined by a characteristic other than the fact of the alleged violation. Defendants submit that under applicable law, even if there is no rational basis for providing services to some individuals but not to others, an equal protection claim fails absent some allegation that state officials acted with a "discriminatory purpose," i.e., that they "selected a particular course of action at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable [class]." *Johnson v. Rodriguez,* 110 F.3d 299, 307 (5th Cir.1997). *See also Westbrook v. City of Jackson,* 772 F.Supp. 932, 942 (S.D.Miss.1991) (no cognizable equal protection claim lies where "[t]he only characteristic common to those residents who were denied the services in question is the fact of their being denied such services . . . .").

In response to the motion, plaintiffs argue that defendants' articulation of the

equal protection standard as requiring a discriminatory animus against a preexisting class was flatly rejected by the Supreme Court in *Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000), and they conclude that because defendants' position rests entirely on an erroneous articulation of equal protection jurisprudence, then defendants' request for dismissal of plaintiffs' equal protection claims should be denied.

*Village of Willowbrook v. Olech* involved an equal protection claim brought by a single individual, a "class of one." There, the Court held that the Equal Protection Clause can give rise to a cause of action on behalf of a "class of one" even when the plaintiff does not allege membership in a protected class or group where it is alleged that the plaintiff was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564, 120 S.Ct. at 1074–75. In reliance on *Olech*, plaintiffs conclude that an equal protection properly lies herein based on their allegation that defendants lack a rational basis for their failure to provide some abused and neglected children with protective and assistive services while at the same time providing such services to other similarly situated children. In the court's opinion, however, plaintiffs do not fit within the "class of one"—type equal protection claim addressed in *Olech* but rather fall within standard equal protection analysis which requires class-based animus. *See Wheeler v. Miller*, 168 F.3d 241, 252 (5th Cir.1999). Moreover, even if their claims were properly analyzed under *Olech*, they still would be subject to dismissal inasmuch as the Fifth Circuit has held that to state a class of one claim sufficient for relief, "a single plaintiff must allege that an illegitimate animus or ill-will motivated her intentionally different treatment from others similarly situated *and*

that no rational basis existed for such treatment." *Shipp v. McMahon*, 234 F.3d 907, 916 (5th Cir.2000) (emphasis added), *overruled on other grounds, McClendon v. City of Columbia*, 305 F.3d 314, 322 (5th Cir.2002); *cf. Bryan v. City of Madison*, 213 F.3d 267, 277 & 277 n. 17 (5th Cir. 2000) (holding that in selective enforcement cases, "plaintiff must prove that the government official's acts were motivated by improper considerations," and expressly noting that the *Olech* decision "does not alter . . . [the] requirement of an improper motive, such as racial animus, for selective enforcement claims"); *Beeler v. Rounsavall*, 328 F.3d 813, 818 (5th Cir.2003) (suggesting that even in selective enforcement cases, improper motive such as ill-will or personal vindictiveness would not support an equal protection claim without some other class-based discrimination, for "[t]he " 'text of the Equal Protection Clause, the history leading to its adoption, [and] a century of jurisprudence that has in the main interpreted the clause to prohibit only disparate treatment based upon group or class factors' " ") (citation omitted).

Accordingly, although plaintiffs do allege that there is no rational basis for the differences in treatment of which they complain, they do not allege that defendants' action or inaction toward them is based on an illegitimate animus directed against them individually or as an identifiable class. Accordingly, the court concludes that defendants' motion is well taken as to plaintiffs' equal protection claims.

*Substantive Due Process—Protective Services Class:*

■ The Protective Services Class plaintiffs assert a "state-created danger" substantive due process claim, alleging that

when DCFS ... determines that the child cannot remain safely in his or her home, it ... routinely places children with any available relatives... The relative caregiver's qualifications are not critically evaluated, criminal background checks are not routinely conducted, and little, if any, effort is made to assess whether the home is safe or meets the child's needs ... [thus] leaving the children in potentially harmful environments, without court oversight... By intentionally leaving abused and neglected children in unscreened and unmonitored homes... Defendants knowingly and arbitrarily place these children at further risk of abuse.

In *DeShaney by DeShaney v. Winnebago County Department of Social Services,* a child who suffered severe injuries as a result of abuse at the hands of his father brought a § 1983 action against state social workers alleging they had violated his substantive due process rights because they were aware of the likelihood of abuse and failed to take steps to protect him or remove him from his father's home. 489 U.S. 189, 191, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). The Court rejected the claim, holding that as a general rule, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197, 109 S.Ct. at 1004. The Court made clear that this rule is not without exception, and specifically held that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198, 109 S.Ct. at 1004. Thus, "[w]hen the state, through the affirmative exercise of its powers, acts to restrain an individual's freedom to act

on his own behalf 'through incarceration, institutionalization, or other similar restraint of personal liberty,' the state creates a 'special relationship' between the individual and the state which imposes upon the state a constitutional duty to protect that individual from dangers, including, in certain circumstances, private violence." *McClendon v. City of Columbia,* 305 F.3d 314, 324–25 (5th Cir.2002) (quoting *DeShaney,* 489 U.S. at 200, 109 S.Ct. at 1006).[4] However, since the state had never removed the child from his father's home, the requisite "special relationship" between the child and the state was lacking.

The Court in *DeShaney* noted that "[w]hile the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201, 109 S.Ct. at 1006. As noted by the Fifth Circuit in *McClendon,* some courts have read this language to suggest that state officials can have a duty to protect an individual from injuries inflicted by a third party if the state actor played an affirmative role in creating or exacerbating a dangerous situation that led to the individual's injury, an exception to the general rule that has come to be known as the "state-created danger" theory. *McClendon,* 305 F.3d at 324–25.

Plaintiffs allege and maintain that the Fifth Circuit recognizes this "state-created danger" theory of § 1983 liability, citing *Scanlan v. Texas A & M University,* 343 F.3d 533, 538 (5th Cir.2003), and insist that the court must therefore deny defendants' motion to dismiss. However, their position completely ignores the long line of cases in which the Fifth Circuit has under-

**4.** It is this exception which furnishes the basis for the substantive due process claim asserted by the In–Custody Class, discussed *infra.*

taken to make clear that it has *not* recognized the state-created danger theory of recovery. Indeed, in the period following *Scanlan,* the Fifth Circuit has repeatedly "emphasiz[ed] that our court has 'not yet determined whether a state official has a ... duty to protect individuals from state-created dangers.'" *Hernandez ex rel. Hernandez v. Texas Dept. of Protective and Regulatory Services* 380 F.3d 872, 880 n. 1 (5th Cir.2004) (quoting *McClendon,* 305 F.3d at 324).[5] *See also Lester v. City of College Station,* 103 Fed.Appx. 814, 814–816 (5th Cir.2004) (stating that "this court has neither adopted nor accepted the state-created-danger theory of liability"); *Greene v. Plano Indep. School Dist.,* 103 Fed.Appx. 542, 543–544, and n. 3 (5th Cir. 2004) ("This Court has not yet decided whether the state created danger theory may serve as a basis for a Due Process Clause claim.... This Court, however, has never held that the state created danger theory is one of the limited circumstances that would rise to the level of a due process constitutional violation contemplated in *DeShaney.*"); *Beltran v. City of El Paso,* 367 F.3d 299, 307 (5th Cir.2004) ("This court has consistently refused to recognize a 'state-created danger' theory of § 1983 liability even where the question of the theory's viability has been squarely presented."); *Priester v. Lowndes County,* 354 F.3d 414, 422 (5th Cir.2004) ("[W]e have clearly stated that this court has neither adopted nor rejected the state-created danger theory."); *Rivera v. Houston Indep. School Dist.,* 349 F.3d 244, 249 (5th Cir.2003) ("We have never recognized

state-created danger as a trigger of State affirmative duties under the Due Process clause.... We again decline to do so."). In *Rivera,* the court noted that in *McClendon v. City of Columbia,* 258 F.3d 432, 436 (5th Cir.2001), a panel of the court had adopted the state-created danger theory, but explained that "after en banc review, the panel's ruling was vacated and with it our recognition of the theory." *Id.* (citing *McClendon v. City of Columbia,* 305 F.3d 314, 333 (5th Cir.2002)). Regarding *Scanlan,* upon which plaintiffs rely exclusively, the court in *Rivera* went on to observe that

> [i]n *Scanlan v. Texas A & M University,* 343 F.3d 533 (5th Cir.2003), we found that "this Court has never explicitly adopted the state-created danger theory." *Id.* at 537. Despite remanding that case to the district court for further proceedings, we did not recognize the state created danger theory.

*Id.* at 249. In light of these numerous unequivocal pronouncements by the Fifth Circuit that it has not recognized a state-created danger theory of liability under § 1983, it is, or at least borders on disingenuous for plaintiffs to contend otherwise.[6] Given that the Fifth Circuit has to date declined to adopt the state-created danger theory of liability, and in the absence of any indication that the court would endorse this theory as a basis for relief, the court concludes that defendants' motion to dismiss the substantive due process claim on behalf of the Protective Ser-

---

**5.** In their response memorandum, plaintiffs, citing the district court's opinion in *Hernandez v. Texas Department of Protective and Reg. Servs.,* 2002 WL 31689710 (N.D.Tex.2002), argue that application of the state-created danger theory to facts similar to those here alleged is "hardly novel." However, on appeal, the Fifth Circuit reversed the lower court's opinion and determined that summary judg-

ment should have been entered for the defendant state foster care agency.

**6.** *See Martinez v. Lueva,* 2004 WL 2403864, *4 (N.D.Tex.2004) (dismissing as frivolous plaintiff's state created danger claims, which were based on "a groundless legal premise" and had "no arguable basis in law").

vices Class should be granted.[7]

The court would observe, though, that even if state-created danger were a cognizable theory in this circuit, the facts of this case, as gleaned from plaintiffs' complaint, would not support its application. In *McClendon*, the court stated that if a state-created danger theory were viable in this circuit, "[i]n order to recover under the ... theory, ... a plaintiff would have to show, at a minimum, that: (1) the state actors created or increased the danger to the plaintiff and (2) the state actors acted with deliberate indifference." 305 F.3d at 322–23 (citing *Piotrowski v. City of Houston*, 51 F.3d 512, 515 (5th Cir.1995)). Thus, a showing of mere negligence would not suffice, but rather the plaintiffs would have to establish deliberate indifference. *See Greene*, 103 Fed.Appx. at 543–544 ("[I]n order to state a viable substantive due process claim the plaintiff must demonstrate that the state official acted with culpability beyond mere negligence.").

> "To establish deliberate indifference, 'a state actor must know[ ] of and disregard[ ] an excessive risk to the [the victim's] health and safety.... The state actor's actual knowledge is critical to the inquiry. A state actor's failure to alleviate 'a state significant risk that he should have perceived but did not,' while 'no cause for commendation,' does not rise to the level of deliberate indifference."

*Morin v. Moore*, 309 F.3d 316, 322 (5th Cir.2002) (quoting *McClendon II*, 305 F.3d at 326) (citations omitted). *See also Lester*, 103 Fed.Appx. at 814–816 ("[E]ven if it is assumed that the state-created-danger theory applies, liability exists only if the

state actor is aware of an immediate danger facing a known victim."); *Hernandez*, 380 F.3d at 880 ("To demonstrate a viable substantive due process claim, in cases involving government action, the plaintiff must show that the state acted in a manner that 'shocks the conscience.'").

In the case at bar, plaintiffs' allegations do not support a conclusion of deliberate indifference. Plaintiffs allege that to avoid the burden on an already overwhelmed child welfare system, defendants routinely place children with any available relative without first evaluating the relative caregiver's qualifications or conducting criminal background checks, without assessing whether the home is safe or meets the child's needs, and without thereafter providing monitoring to determine whether the child is safe. According to plaintiffs, by placing and leaving abused and neglected children in unscreened and unmonitored homes, defendants "knowingly and arbitrarily place these children at further risk of abuse." Construing the complaint liberally in favor of plaintiffs, the most they have alleged is mere negligence; their allegations do not support a finding of deliberate indifference, so even assuming a theory of liability for state-created danger, the Protective Services plaintiffs would not be entitled to any relief. Accordingly, this claim will be dismissed.

*Substantive Due Process—In–Custody Class*

■ Defendants do not dispute that the State has a "special relationship" with the In–Custody Class members that gives rise to a duty to provide "constitutionally adequate care" and safekeeping. *See Griffith v. Johnston*, 899 F.2d 1427, 1439 (5th Cir.

---

7. The court obviously recognizes that many, if not most of the issues presented by defendants' motion are issues as to which there is both a divergence of opinion among the courts and a lack of Fifth Circuit authority.

Thus, while the court has striven to arrive at conclusions that it considers well-reasoned, it necessarily recognizes that its resolution on the issues presented may be considered debatable by some.

1990) (state Department of Human Services created a "special relationship" with children when it removed them from their natural homes and placed them under state supervision, at which time the department "assumed the responsibility to provide constitutionally adequate care for these children").

█ In their complaint, plaintiffs allege that defendants have denied the In–Custody Class members "safe, stable and appropriate placements necessary to their health and well-being," and have failed to provide them with "necessary medical, dental, and mental health services ... [causing them] physical and emotional harm[,]" and have thereby failed to "exercise reasonable professional judgment" and acted with "deliberate indifference to in-custody Plaintiff children's constitutional rights."

Defendants suggest in their motion that this claim is due to be dismissed because plaintiffs have misstated both the scope and standard by which courts determine whether defendants have violated their duty to provide constitutionally adequate care. The proper standard, according to defendants, is whether state officials have acted with deliberate indifference to the rights of children in state custody, and not whether state officials are providing care, treatment, and services consistent with competent professional judgment. The fact is, though, that regardless of what standard the court may determine to be applicable, plaintiffs' pleading is sufficient to allege a violation of their substantive due process right to adequate care and treatment while in state custody.[8] Accordingly, defendants' motion to dismiss plaintiffs' sixth count on the basis discussed is rejected.[9]

*Adoption Assistance and Child Welfare Act*

In count eight of their complaint, plaintiffs allege that defendants are engaging in a policy, pattern, practice and/or custom of depriving members of the In–Custody plaintiff class of the rights conferred upon them by various provisions of the federal Adoption Assistance and Child Welfare Act of 1980 (AACWA), 42 U.S.C. §§ 620–628, 670–679a. In their motion, defendants assert that plaintiffs' claims under the AACWA must be dismissed inasmuch as this Act is nothing more than a grant

8. As plaintiffs note, whereas the "deliberate indifference" standard has been applied in the penal context as describing the applicable standard, many courts have applied a broader "professional judgment" standard to children in foster care. *See, e.g., Yvonne L. v. New Mexico Dept. of Human Servs.*, 959 F.2d 883, 894 (10th Cir.1992) (applying the professional judgment standard in a foster care case); *Brian A. ex rel. Brooks v. Sundquist*, 149 F.Supp.2d 941, 952–954 (M.D.Tenn.2000) (applying professional judgment standard); *LaShawn A. v. Dixon*, 762 F.Supp. 959 (D.D.C.1991)(same). The reasoning that has led the courts to this conclusion is exemplified by the opinion in *LaShawn A.*, where the court stated,

[T]he rights of a person in the civil custody of the state are greater than the rights of a person in the state's criminal custody. The foster children that make up the plaintiff class in this case have done society no wrong and they deserve no punishment. It would be inappropriate to force them to endure constitutional deprivations absent a showing of "deliberate indifference" by their caretakers. At the same time, it would be inappropriate to hold caretakers liable for constitutional deprivations when those caretakers had exercised their professional judgment in determining the best course of conduct.

*LaShawn A.*, 762 F.Supp. at 996.

9. Defendants urge, as an alternative basis for dismissal, that this court must abstain from considering these plaintiffs' due process claim under the abstention doctrine of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The court considers this aspect of the motion *infra*.

program which does not create any federal rights enforceable under § 1983.

While § 1983 is usually invoked in cases where a plaintiff is alleging a constitutional violation, it also extends by its terms to certain federal statutory violations, since it provides a remedy to those who suffer a "deprivation of any rights, privileges, or immunities secured by the Constitution *and laws*" of the United States. *Frazar v. Gilbert*, 300 F.3d 530, 537–38 (5th Cir.2002), *rev'd sub nom. on other grounds*, 540 U.S. 431, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004). However, "[p]roof of a violation of a federal statute, by itself, does not entitle a plaintiff to relief under § 1983." *Id.* at 538. Rather, to obtain relief under § 1983, "a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law.*" *Id.* (quoting *Blessing v. Freestone*, 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997)). To establish that a particular statutory violation amounts to a violation of a statutory *right* actionable under § 1983, a plaintiff must demonstrate that: (1) the provision in question was intended to benefit the plaintiff; (2) the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence; and (3) the provision imposes a binding obligation on the State, i.e., that the provision giving rise to the asserted right is couched in mandatory, rather than precatory, terms. *Id.* (citing *Blessing*); *see also Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 509, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (setting forth these three requirements).

In *Gonzaga University v. Doe*, the Court emphatically "reject[ed] the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." 536 U.S. 273, 282–83, 122 S.Ct. 2268, 2275,

153 L.Ed.2d 309 (2002). In this vein, the court clarified that "it is *rights,* not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of that section," *id.* at 274, 120 S.Ct. at 2270, and it is thus not sufficient that a statute is intended to confer a benefit on a particular class of persons; rather, it must be clear that Congress intended to confer individual rights upon a class of beneficiaries. *Id.* at 282, 120 S.Ct. at 2275. *See also California v. Sierra Club*, 451 U.S. 287, 294, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981) ("The question is not simply who would benefit from the Act, but whether Congress intended to confer federal rights upon those beneficiaries") (cited in *Gonzaga Univ.*, 536 U.S. at 286, 122 S.Ct. at 2276–77).

If a plaintiff demonstrates that a federal statute creates an individual right, "'there is only a rebuttable presumption that the right is enforceable under § 1983,'" *Frazar*, 300 F.3d at 539 (quoting *Blessing*, 520 U.S. at 341); that is, because the court's inquiry "'focuses on congressional intent, dismissal is proper if Congress specifically foreclosed a remedy under § 1983," either expressly, "'by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'" *Id.* (quoting *Blessing*, 520 U.S. at 341, 117 S.Ct. 1353).

Generally speaking, the AACWA is a federal funding statute establishing a program of payments to states for foster care and adoption assistance. The Act, which comprises Parts B and E of Title IV of the Social Security Act, establishes a cooperative federal-state program in which the federal government reimburses the state for certain expenses the state incurs in administering foster care and adoption services if the state satisfies the require-

ments imposed by the Act, principal among which is a requirement that the state submit for approval by the Secretary of Health and Human Services a plan for foster care and adoption assistance which adheres to specific delineated requirements, 42 U.S.C. § 671(a),[10] including provision for "foster care maintenance payments in accordance with section 672 of this title[11] and for adoption assistance in accordance with section 673 of this title," see § 671(a)(1); (2) provision for the establishment, maintenance and application of standards "for foster family homes and child care institutions which are reasonably in accord with recommended standards of national organizations concerned with standards for such institutions or homes, including standards related to admission policies, safety, sanitation, and protection of civil rights," see § 671(a)(10); and provision "for the development of a case plan (as defined in section 675(1) of this title) for each child receiving foster care maintenance payments under the State plan and ... for a case review system which meets the requirements described in section 675(5)(B) of this title with respect to each such child." Section 675, in turn, defines terms used in various provisions of the Act, including, among others, "case plan," see § 675(1), and "case review system," see § 675(5).

If a state follows its approved plan, it receives federal funds. 42 U.S.C. § 670; 42 U.S.C. § 1320a–2a. If it does not follow its approved plan, then it may lose some or all of the federal funds it would otherwise receive. Section 1320a–2a requires the Secretary to promulgate regulations for use in reviewing state programs in order to determine whether the programs are in substantial conformity with the state plan. 42 U.S.C. § 1320a–2a(a)(3). Under the statute, the regulations must require the Secretary to withhold federal funds if a state has failed to substantially conform to its approved plan, § 1320a–2a(b)(3), and indeed, the regulations do just that, 45 C.F.R. §§ 1355.35(c)(4), 1355.36(b). *31 Foster Children v. Bush*, 329 F.3d 1255, 1270–1271 (11th Cir.2003) (summarizing AACWA).

Turning to the case at bar, plaintiffs herein allege that defendants have violated various rights conferred on them by the AACWA, including (1) the right to the development and implementation of individual case plans that contain specific mandated elements, including documentation of steps taken to achieve permanency, (2) the right to live in foster care placements that have the capacity to provide for the essential needs and services of children in their care by receiving adequate foster care maintenance payments, (3) the right to a case record review system which includes semi-annual administrative reviews and annual permanency reviews, (4) to placement only in facilities that have been licensed by the state; (5) to placement in

**10.** Section 671(a), entitled "Requisite features of State plan," recites that "[i]n order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which" includes certain "requisite features" for foster care and adoption assistance.

**11.** Section 672 details the qualifications of children for receiving foster care payments. Section 675(4)(A) defines the term "foster care maintenance payments" as

payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation. In the case of institutional care, such term shall include the reasonable costs of administration and operation of such institution as are necessarily required to provide the items described in the preceding sentence.

foster homes that conform to national professional standards, (6) the right to placement in the least restrictive, most family-like setting; (7) to have a petition to terminate parental rights filed, or have a compelling reason documented why such a petition has not been filed, in accordance with specified statutory standards and time frames; and (8) the right of foster children whose permanency goal is adoption to planning and services to obtain permanent placement at the earliest possible time and (9) the right to have health and educational records reviewed, updated and supplied to foster care providers with whom the child is placed at the time of placement. Each of these alleged rights, according to plaintiffs, is traceable to one or more provisions of the AACWA, which entitles them to seek relief via § 1983.

A review of the case law reveals a split of authority over whether the AACWA, or particular provisions of the Act,[12] including those cited by plaintiffs, create any privately enforceable rights.[13] Prior to 1992, several courts had held that Section 671(a) of the Act created a private right of action. *See L.J. v. Massinga,* 838 F.2d 118, 123 (4th Cir.1988); *LaShawn A. v. Dixon,* 762 F.Supp. 959, 989 (D.D.C.1991), *aff'd in part,* 990 F.2d 1319 (D.C.Cir.1993); *Lynch v. Dukakis,* 719 F.2d 504, 512 (1st Cir.

1983). In 1992, however, the Supreme Court held that Section 671(a)(15)[14] created the right only to the plan itself, and not to the implementation of the plan because Section 671(a)(15) was too vague and amorphous to create the private remedy sought by the plaintiffs. *Suter v. Artist M.,* 503 U.S. 347, 362–64, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). In 1994, in response to the Supreme Court's decision in *Suter,* Congress amended the Act as follows:

> In an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning such grounds applied in *Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this section is not intended to alter the holding in *Suter v. Artist M.* that section 671(a)(15) of this title is not enforceable in a private right of action.

42 U.S.C. § 1320a–2. Although courts have come to different conclusions as to

---

12. In *Blessing* the Court explained that the specific statutory provisions at issue as well as entire legislative enactment should be analyzed to determine whether those provisions create enforceable right within meaning of § 1983. 520 U.S. at 340, 117 S.Ct. at 1360 (observing that "[o]nly when the complaint is broken down into manageable analytic bites can a court ascertain whether each separate claim satisfies the various criteria we have set forth for determining whether a federal statute creates rights.").

13. The Fifth Circuit has not yet considered the question. Indeed, while the defendants in *Del A. v. Edwards,* 855 F.2d 1148, 1151 (5th Cir.1988), argued that the AACWA did not

create substantive rights enforceable under § 1983, the Fifth Circuit avoided the issue, stating that "it would be premature for us to decide these abstruse questions on this interlocutory appeal because they do not directly affect the issue of qualified immunity."

14. Section 671(a)(15) requires that for a state to be eligible for payments under the Act, the state must have a plan approved by the Secretary which provides that

> In each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home.

the meaning and/or effect of this amendment, in this court's view, the purpose of the amendment was simply to clarify that "the mere fact that an obligation is couched in a requirement that the State file a plan is not itself sufficient grounds for finding the obligation unenforceable under § 1983." *Harris v. James,* 127 F.3d 993, 1003 (11th Cir.1997). The court, in accordance not only with *Suter* but with pre-*Suter* case law, must look to the substance of the plan's requirements, to determine whether Congress intended to create a right enforceable via § 1983.

In the case at bar, plaintiffs allege that defendants have violated their right to "a case record review system" which includes semi-annual administrative and permanency reviews, and their right to placement in the least restrictive, most family-like setting, to have a petition to terminate parental rights filed in a timely manner, and to have health and education records supplied to foster care providers.

Section 675(5) of the AACWA provides, in relevant part:

The term "case review system" means a procedure for assuring

(A) each child has a case plan designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child ...

(B) the status of each child is reviewed periodically but no less frequently than once every six months by either a court or by administrative review ... in order to determine the safety of the child and continuing necessity for and appropriateness of the placement, the extent of compliance with the case plan, and the extent of progress which has been made toward alleviating or mitigating the causes necessitating placement in foster care, and to project a likely date by which the child may be returned to and safely maintained in the home or placed for adoption or legal guardianship,

(C) with respect to each such child, procedural safeguards will be applied, among other things, to assure each child in foster care under the supervision of the State of a permanency hearing to be held, in a family or juvenile court or another court (including a tribal court) of competent jurisdiction, or by an administrative body appointed or approved by the court, no later than 12 months after the date the child is considered to have entered foster care (as determined under subparagraph (F)) (and not less frequently than every 12 months thereafter during the continuation of foster care), which hearing shall determine the permanency plan for the child that includes whether, and if applicable when, the child will be returned to the parent, placed for adoption and the State will file a petition for termination of parental rights, or referred for legal guardianship, or (in cases where the State agency has documented to the State court a compelling reason for determining that it would not be in the best interests of the child to return home, be referred for termination of parental rights, or be placed for adoption, with a fit and willing relative, or with a legal guardian) placed in another planned permanent living arrangement...

(D) a child's health and education record (as described in paragraph (1)(A)) is reviewed and updated, and supplied to the foster parent or foster care provider with whom the child is placed, at the time of each placement of the child in foster care;

(E) in the case of a child who has been in foster care under the responsibility of the State for 15 of the most recent 22

months, or, if a court of competent jurisdiction has determined a child to be an abandoned infant (as defined under State law) or has made a determination that the parent has committed murder of another child of the parent, committed voluntary manslaughter of another child of the parent, aided or abetted, attempted, conspired, or solicited to commit such a murder or such a voluntary manslaughter, or committed a felony assault that has resulted in serious bodily injury to the child or to another child of the parent, the State shall file a petition to terminate the parental rights of the child's parents (or, if such a petition has been filed by another party, seek to be joined as a party to the petition) . . . .

In *31 Foster Children*, the Eleventh Circuit rejected the plaintiffs' claims that §§ 675(5)(D) and (E) gave the plaintiffs therein a right enforceable under § 1983. The court's reasoning as it pertained to these provisions was thorough, and in this court's opinion, correct. That reasoning, by its logic, extends as well to the claims brought by plaintiffs herein under subsections (A) and (C) of § 675.

The court in *31 Foster Children* recognized that as definitional provisions, § 675(D) and (E) "alone cannot and do not supply a basis for conferring rights enforceable under § 1983." 329 F.3d at 1271 (citing *Gonzaga*, 536 U.S. at 280, 122 S.Ct. at 2273).[15] The only other provision in Part E of Title IV that uses the term "case review system," the court noted, is 42

U.S.C. § 671(a)(16); yet while that section explicitly conditions a state's receipt of federal funds on the existence of a state plan that, among other things, provides for "a case review system which meets the requirements described in section 675(5)(B) . . . with respect to each such child," it "does not go beyond that and explicitly require a plan to meet the requirements described in §§ 675(5)(D) and (E)." *Id.* That is, whereas § 671(a)(16) "plainly directs that the state must have a plan that provides for a case review system 'which meets the requirements described in section 675(5)(B) of this title,'" that provision "does not say that a plan's case review system must meet the requirements of §§ 675(5)(D) and (E)." *Id.* Likewise, § 671(a)(16) does not require that a plan's case review system must meet the requirements of §§ 675(5)(A) and (C).[16]

The court further opined that §§ 675(5)(D) and (E) "do not have the kind of focused-on-the-individual, rights-creating language required by *Gonzaga*" and instead, "has an aggregate or system wide focus." *Id.* at 1272. In so concluding, the court acknowledged that "the text of the provisions speaks to 'a child's health and education record' provided at 'each placement of the child' and to termination of the parental rights of 'the child's parents,'" but it recognized that "the case review system as a whole is defined as 'a procedure for assuring' that the desired steps are taken." *Id.* (citing 42 U.S.C. § 675(5)). In other words, "[t]he references to indi-

---

**15.** *See also Charlie H. v. Whitman*, 83 F.Supp.2d 476, 490 (D.N.J.2000) (§ 675(5), standing alone, does not confer a right enforceable under § 1983); *B.H. v. Johnson*, 715 F.Supp. 1387, 1401 (N.D.Ill.1989) ("It would be strange for Congress to create enforceable rights in the definitional section of a statute."). . .

**16.** It does, however, state that the case plan must provide for a case review system "which meets the requirements described in section 675(5)(B) of this title," which requires periodic administrative reviews. Nevertheless, the remaining rationale for the court's conclusion in *31 Foster Children* applies fully to plaintiffs' claims herein based on § 675(5)(B) and § 671(a)(16).

vidual children and their placements are made in the context of describing what the procedure is supposed to ensure," and such provisions, the court opined, " 'cannot make out the requisite congressional intent to confer individual rights enforceable by § 1983'." *Id.* (quoting *Gonzaga,* 536 U.S. at 289, 122 S.Ct. at 2278).

The lack of individual focus, the court observed, was apparent not just from the text and structure of the Act itself, but also from the fact of Congress's directive that the Secretary of Health and Human Services promulgate regulations "for the review of the child welfare and adoption assistance programs set out in Parts B and E in order 'to determine whether such programs are in *substantial conformity* with—State plan requirements under such parts B and E.' " *Id.* (quoting 42 U.S.C. § 1320a–2a(a)(1) (emphasis in *31 Foster Children* ).) The court noted that this "substantial conformity requirement" is similar to the substantial conformity requirement in the Family Educational Rights and Privacy Act of 1974 which the Court in *Gonzaga* had concluded evidenced an aggregate rather than individual focus. *Id.* (citing *Gonzaga,* 536 U.S. at 288, 122 S.Ct. at 2278, and also citing *Blessing,* 520 U.S. at 335, 343, 117 S.Ct. at 1357, 1361 (holding that Title IV–D of the Social Security Act did not support a right enforceable pursuant to § 1983, in part because the statute mandated "substantial compliance" with federal regulations)).

In the case at bar, plaintiffs argue that *31 Foster Children* is not persuasive authority for this case, for here, unlike the plaintiffs in *31 Foster Children,* plaintiffs do not rely on § 675(D) and (E) alone or solely in conjunction with § 671(a)(16), but instead, they also rely on 42 U.S.C. § 622(b)(10)(B)(ii). However, while it is true that the Eleventh Circuit specifically confined its analysis to § 675(5)(B) and (D)

since plaintiffs had not invoked 42 U.S.C. § 622(b)(10)(B)(ii), the court did note that "other courts have found that § 622(b)(10)(B)(ii) … does not confer an enforceable right." *Id.* at 1271 n. 8 (citing *Charlie H. v. Whitman,* 83 F.Supp.2d 476, 485–89 (D.N.J.2000) (§ 622(b)(10)(B)(ii) is not so unambiguous as to confer a right enforceable under § 1983), and *Eric L. v. Bird,* 848 F.Supp. 303, 312 (D.N.H.1994) (plaintiffs have no enforceable right to compel state's implementation of programs under predecessor to § 622(b)(10)(B)(ii))).

42 U.S.C. § 622(b)(10)(B)(ii) provides, in relevant part, that "[e]ach plan for child welfare services under [42 U.S.C. § 622(a) ] shall—provide assurances that the State—is operating, to the satisfaction of the Secretary—a case review system (as defined in section 675(5) of this title) for each child receiving foster care under the supervision of the State." In *Charlie H.,* the court focused on the language of 42 U.S.C. § 622(b)(10)(B) indicating that particular aspects of the state's plan must be operating *"to the satisfaction of the secretary,"* and aptly remarked, "Clearly," this Court does not sit to oversee New Jersey's child welfare system to determine whether certain components of the system are "operating, *to the satisfaction of the Secretary." Charlie H.,* 83 F.Supp.2d at 485.

For the reasons set forth in *31 Foster Children,* the court concludes that plaintiffs' herein have no enforceable rights under § 675(A), (C), (D) or (E), alone or in conjunction with either § 671(a)(16) or § 622(b)(10)(B)(ii). *See also Charlie H.,* 83 F.Supp.2d at 490 (D.N.J.2000) (dismissing plaintiffs' § 1983 claim under 42 U.S.C. § 675(5)(A) to placement in the least restrictive, most family-like setting because such a right is too vague and amorphous to be judicially enforceable); *Aristotle P. v. Johnson,* 721 F.Supp. 1002, 1012 (N.D.Ill. 1989) (holding that right to be placed "in

the least restrictive, most family like setting" is amorphous and not subject to precise definition); *cf. Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 25, 101 S.Ct. 1531, 1544, 67 L.Ed.2d 694 (1981)(remarking that "[i]t is difficult to know what is meant by 'appropriate treatment' in the 'least restrictive setting,' and it is unlikely that a State would have accepted federal funds had it known that it would be bound to provide such treatment.").

Plaintiffs' claim of a right to placement in foster homes or facilities that conform to national professional standards is based on § 671(a)(10), *supra.* As to this claim, the court herein concurs in the reasoning which led the Fourth Circuit to conclude in *White by White v. Chambliss,* 112 F.3d 731, 739 (4th Cir.1997), that § 671(a)(10) does not create an individual federal right enforceable via § 1983. There, the court stated:

> The requirement that a state's plan be "reasonably in accord with recommended standards of national organizations," is no more specific than section 671(a)(15)'s "reasonable efforts" requirement. Furthermore, the AACWA provides no "statutory guidance" to clarify the meaning of the requirements of 671(a)(10). Lastly, section 671(a)(10) is enforceable through the same alternative enforcement mechanism provided for section 671(a)(15). As the Supreme Court noted in *Suter,* "[t]he Secretary [of Health and Human Services] has the authority to reduce or eliminate payments to a State on finding that the State's plan no longer complies with

§ 671(a) or that 'there is a substantial failure' in the administration of a plan such that the State is not complying with its own plan." 503 U.S. at 360, 112 S.Ct. at 1368. *Suter* thus forecloses the argument that section 671(a)(10) of the AACWA provides the source for an enforceable right through section 1983.[17]

*See also Yvonne L., By and Through Lewis v. New Mexico Dept. of Human Servs.,* 959 F.2d 883, 889 (10th Cir.1992) ("The language of § 671(a)(10) .. is the type of vague and amorphous language that cannot be judicially enforced."); *Charlie H.,* 83 F.Supp.2d at 490–91 ("Plaintiffs' alleged right to 'placement in foster homes or facilities that conform to nationally recommended professional standards' based upon 42 U.S.C. § 671(a)(10) is too vague and amorphous under the [pre-*Suter*] test to be enforced pursuant § 1983."); *Whitley v. New Mexico Children, Youth & Families Dept.,* 184 F.Supp.2d 1146, 1164 (D.N.M.2001) ("the language of § 671(a)(10) by itself does not support such a cause of action because its language is too vague and amorphous"); *Daniel H. ex rel. Hardaway H. v. City of New York,* 115 F.Supp.2d 423, 427 (S.D.N.Y.2000) ("The Court ... concludes that, to the extent these provisions of the Act may have been intended to confer an individual benefit, it is expressed in language too imprecise to be judicially enforced."). *But see Brian A. ex rel. Brooks v. Sundquist,* 149 F.Supp.2d 941, 948 (M.D.Tenn.2000) ("The Court finds the language of Section (10) to be sufficiently specific to create a private right of action for enforcement

---

**17.** The court observed in a footnote that "[t]he congressional response to *Suter* codified at 42 U.S.C. § 1320a–2 does not alter our view," stating, *inter alia,*

> Congress made clear that the statute was "not intended to alter the holding in *Suter v. Artist M.* that section 671(a)(15) ... is not

enforceable in a private right of action." 42 U.S.C. § 1320a–2. Lastly, *Suter* itself was not a novel holding, but rather rested upon settled legal principles with regard to private rights of action in the context of the AACWA.

*White by White,* 112 F.3d at 739.

thereof."); *Jeanine B. by Blondis v. Thompson,* 877 F.Supp. 1268, 1284 (E.D.Wis.1995) ("These provisions are not vague, not amorphous, and certainly not beyond a court's ability to understand and to enforce.").

Plaintiffs also assert a right, grounded on § 675(a)(1), "to the development and implementation of individual case plans that contain specific mandated elements including documentation of the steps taken to achieve permanency." That section requires that defendants, as a condition of receiving federal funds, take steps necessary to ensure that each foster child is provided with a written case plan, containing specified elements, that is reviewed and updated at specified intervals, and that services are provided in accordance with that plan. In *Charlie H., supra,* the court rejected a claim that Congress intended to grant an enforceable right to the plaintiff foster children " 'to timely written case plans that contain mandate elements and to the implementation and review of these plans.' " In doing so, the court reiterated that it did not "sit to oversee New Jersey's child welfare system to determine whether the implementation of case plans [was] 'appropriate' or 'successful,' " and observed,

> This is especially true where "[w]hether a child has a plan satisfying [each] provision is as individual as each child" and "there is no way to measure the normal or average needs of a child in foster care." *Del A. v. Roemer,* 777 F.Supp. 1297, 1309 (E.D.La.1991). Moreover, regardless of the detailed nature of the definitions of "case plan" and "case review system," the statutory provisions relied upon by Plaintiffs in support of their alleged right "to timely written case plans that contain mandate elements and to the implementation and review of these plans" are not so unambiguous so as to confer upon Plaintiffs a

right enforceable under § 1983. *See Eric L. v. Bird,* 848 F.Supp. 303, 312 (D.N.H.1994) (holding that "plaintiff enjoy no enforceable rights" to "compel New Hampshire's full implementation of the programs" under 42 U.S.C. § 627(a)(2)(B), the predecessor to 42 U.S.C. § 622(b)(10)(B)(ii), because the provision "places no direct obligation on the state"); *Baby Neal v. Casey,* 821 F.Supp. 320, 328 (E.D.Pa.1993) (holding that the language of § 627(a)(2)(B), the predecessor to 42 U.S.C. § 622(b)(10)(B)(ii), "examined in the context of the entire Adoption Act" does not "unambiguously confer an enforceable right on behalf of its beneficiaries under 42 U.S.C. § 1983"); *Del A. v. Roemer,* 777 F.Supp. 1297, 1308–09 (E.D.La.1991) (holding 42 U.S.C. § 627(a)(2)(B), the predecessor to 42 U.S.C. § 622(b)(10)(B)(ii), and 42 U.S.C. § 671(a)(16) "so vague and amorphous as to evade judicial enforcement" of plaintiffs' claim for "case plans that address specific issues in their placements and care" because "[t]here is no objective benchmark" against which compliance with these provisions can be measured).

83 F.Supp.2d at 488. The court concluded that for the same reasons, the "plaintiffs' § 1983 claims asserting a right to 'planning and services to secure their permanent placement at the earliest possible time, including documentation of the steps taken to secure permanency' under 42 U.S.C. § 675(1)(E)," were not cognizable. *Id.* at 489 n. 2.

Although this court recognizes that there are cases-indeed numerous cases-that have interpreted the provisions under consideration in the case at bar to create rights on the part of children that are enforceable under § 1983, this court, having reviewed the cases on the issues pre-

sented, finds that the analysis and conclusions of the courts that have come to the contrary conclusion to be more persuasive, and consistent with the Supreme Court's directive that nothing short of "an unambiguously conferred right" will support a cause of action under § 1983. *See Gonzaga*, 536 U.S. at 282–83, 122 S.Ct. at 2275.[18]

For the reasons given, the court concludes that defendants' motion to dismiss plaintiffs' claims under the AACWA should be granted.

### Younger Abstention

Defendants maintain that the *Younger* abstention doctrine requires dismissal of any remaining claims by the In–Custody Class, arguing more particularly that the youth courts of Mississippi exercise continuing jurisdiction over each child in state

custody and provide a forum for asserting claims involving the care and treatment of these children. Having considered the parties' arguments in light of plaintiffs' complaint and pertinent authorities, the court is unable to conclude that *Younger* abstention is necessarily appropriate as to all plaintiffs' claims for relief.

■ The *Younger* abstention doctrine is based on notions of comity and federalism, and prohibits federal judicial interference with pending state judicial and state administrative proceedings of a judicial or quasi-judicial character where important state interests are involved and the plaintiff has or will have an opportunity to present his federal claims in the state proceedings.[19] *Geotes v. Mississippi Bd. of*

---

**18.** In *Charlie H.*, the court noted to an additional point which hindered the plaintiffs' claim under 42 U.S.C. § 671(a)(16) with respect to case plans, namely, "that Congress specifically examined the numerous State plan elements required under 42 U.S.C. § 671 and determined that only one such required element confers a private right enforceable pursuant to § 1983." 83 F.Supp.2d at 489. More to the point, the court noted that in 1996, Congress amended 42 U.S.C. § 674 by adding subsection (d) which expressly provides that "[a]ny individual who is aggrieved by a violation of Section 671(a)(18) of this title by a State or other entity may bring an action seeking relief from the State or other entity in any United States district court." *Id.* (quoting 42 U.S.C. § 674(d)(3)(A)). The court concluded,

> That Congress recently chose to amend 42 U.S.C. § 674 to include a private right of action under § 1983 for a state or other entity's failure to comply with 42 U.S.C. § 671(a)(18), but *did not include the other* various elements enumerated in 42 U.S.C. § 671(a) and relied upon by Plaintiffs, is strong evidence that Congress did not intend these other various State plan elements in 42 U.S.C. § 671(a) to confer rights enforceable pursuant to § 1983. *See Wright v. Roanoke Redevelopment and Hous. Auth.*, 479 U.S. 418, 423, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987) (noting that a court

may look to "other specific evidence from the statute itself" to determine whether § 1983 provides a remedial cause of action).

*Id.* Plaintiffs herein dispute the significance of the referenced amendment and submit that it may not fairly be deduced from the fact of the amendment that Congress did not intend that other provisions of the Act were to create enforceable rights. In the court's opinion, however, this is certainly a reasonable inference.

**19.** As the Fifth Circuit noted in *Louisiana Debating and Literary Ass'n v. City of New Orleans*, 42 F.3d 1483, 1489 (5th Cir.1995), "[o]ne of the more vital considerations underlying the doctrine is

> the notion of "comity," that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.... What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect

*Veterinary Medicine,* 986 F.Supp. 1028, 1031 (S.D.Miss.1997). The Supreme Court has devised a three-part inquiry to determine whether *Younger* abstention is appropriate, which asks (1) whether the judicial or judicial-in-nature state proceedings are ongoing; (2) whether the proceedings implicate important state interests; and (3) whether there is an adequate opportunity in the state proceeding to raise constitutional challenges. *Id.* (citing *Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982)). If each of these inquiries is answered in the affirmative, then the district court must dismiss the federal action and allow the state process to continue.

■■■ As defendants note, Mississippi's Youth Court Law dictates that when it becomes necessary that a child be removed from the control of his or her parents, "the youth court shall secure proper care for such child." Miss.Code Ann. § 43–21–103. Toward that end, the Act grants the youth courts exclusive original and continuing jurisdiction in all proceedings concerning such child, Miss.Code Ann. § 43–21–151, and grants them the full power and authority to issue all writs and processes, including contempt orders, necessary to carry out their duties, Miss.Code Ann. § 43–21–153.

Pursuant to Mississippi Code Annotated § 43–21–301, the youth court may initially order that a child be taken into custody of the DHS for up to forty-eight hours if probable cause exists to believe that the child is endangered or a parent, guardian or custodian is not available to care for the child, and following a shelter hearing, may order that custody be continued upon a

finding that continuation of the child's residing in his or her home would be contrary to his or her welfare, that placement in foster care is in the child's best interest and that there is no reasonable alternative to custody. The child may be released by the court upon a finding that a change of circumstances makes continued custody unnecessary. Miss.Code Ann. § 43–21–313. Once a child has been ordered into custody, the youth court "may arrange for the custody of the child with any private institution or agency caring for children, may commit the child to the Department of Mental Health pursuant to Section 41–21–61 *et seq.,* or may order the Department of Human Services or any other public agency to provide for the custody, care and maintenance of such child." The "dispositional alternatives" available to the court are prescribed by statute, and include (but are not limited to) releasing the child without further action; placing the child in the custody of his/her parents, a relative or other person (including foster care placement) subject to such conditions and limitations as the court may prescribe; giving custody of the child to the DHS for appropriate placement; or giving custody of the child to any private or public organization able to assume the child's education, care and maintenance which has been found suitable by the court.

Once a disposition order for placement of a child with an individual or agency has been made, the youth court is charged to review its order at least annually to determine if continued placement is in the child's best interest, and is further mandated to conduct a permanency hearing within twelve months of the earlier of the date of the child's removal from his/her

federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States."

*Id.* (quoting *Younger,* 401 U.S. at 44, 91 S.Ct. at 750).

home or the date the child was adjudicated as abused or neglected, whichever was earlier, and every twelve months thereafter, for the purpose of determining "the future status of the child," including whether the child should be returned to his/her parents, placed with suitable relatives or placed for adoption.

In addition to these provisions relating specifically to the youth court's jurisdiction and charge, Mississippi Code Annotated § 43–15–13 requires that the DHS administer a system of individualized plans and reviews every six months for each child under its custody pursuant to order of the youth court. Under this statute, a "foster care review" is required to be conducted once every six months, and may be conducted by the youth court or its designee(s) and/or by personnel within the State Department of Human Services or by designees of the department, and must include an evaluation of the child based on specified criteria, including, among other things, the "degree of compliance by the agency and the parents with the social service plan established," "methods of achieving the goal and the plan establishing a permanent home for the child," "[s]ocial services offered and/or utilized to facilitate plans for establishing a permanent home for the child," and relevant testimony and recommendations from persons who may have an interest in the case, including foster parents, relatives and social workers assigned to the case. Each child's review plan is required to be filed with the youth court which awarded custody. Upon such filing,

> The court shall make a finding as to the degree of compliance by the agency and the parent(s) with the child's social service plan. The court also shall find that the child's health and safety are the paramount concern. In the interest of

the child, the court shall, where appropriate, initiate proceedings on its own motion.

Miss.Code Ann. § 43–15–13.

Plaintiffs acknowledge that the youth courts of Mississippi have continuing jurisdiction over children in state custody, but deny that the fact of youth court jurisdiction is the equivalent of "ongoing judicial proceedings" for purposes of *Younger*. That is, they deny that there are "ongoing" state court proceedings involving the plaintiffs or members of the In–Custody Class solely by virtue of their in-custody status, and they further submit that in any event, the relief they seek in this federal proceeding would not interfere with any such proceedings since the relief they seek is directed not at the youth courts but rather solely at the state executive branch. Finally, they argue that to the extent the named plaintiffs and class members' individual cases could be considered "ongoing judicial proceedings" for *Younger* purposes, *Younger* abstention still is not warranted since these individual state proceedings do not provide an adequate forum for the broad injunctive relief that plaintiffs seek.[20]

In view of the continuing nature of the duties and responsibilities statutorily imposed upon the state's youth courts, this court agrees with defendants that youth court proceedings may fairly be said to be "ongoing" in the case of each child over whom the youth courts have assumed jurisdiction. However, the question presented under the first prong of the *Younger* inquiry is not simply whether there are ongoing state judicial proceedings, but whether the federal proceeding at issue will interfere with such state proceedings. Unfortunately, owing to the generality of plaintiffs' prayer for relief in the case at

---

**20.** Plaintiffs do not deny that these proceedings implicate important state interests.

568

bar, that determination is not as readily made as it might otherwise have been.[21] Although plaintiffs' complaint challenges defendants' actions and inaction in numerous areas, their request for relief is quite general. They broadly request that this court "[d]eclare unconstitutional[/or] and unlawful ..." defendants' violation of their rights under the due process clause, equal protection clause, the AACWA and Mississippi Code Annotated § 43–21–609(b) and (c)(ii), that the court "[p]ermanently enjoin defendants from subjecting members of the Plaintiff class to practices that violate their rights," and "[o]rder appropriate remedial relief to ensure that a detailed plan is developed, implemented, and monitored to ensure Defendants protect the legal rights of Plaintiffs as set forth in this complaint." Nevertheless, for the reasons that follow, the court is not persuaded that abstention is necessarily required.

*Joseph A. ex rel. Corrine Wolfe v. Ingram,* 275 F.3d 1253 (10th Cir.2002), involved the defendants' alleged violation of certain provisions of a federal consent decree. The district court granted the defendants' motion to abstain under *Younger,* concluding that enforcement of the consent decree would interfere with ongoing juvenile court proceedings. On appeal, the Tenth Circuit agreed that *Younger* mandated that the federal courts abstain from enforcing at least some of the consent decree's provisions. However, it remanded the case to the district court for a "provision-by-provision *Younger* analysis," stating:

> After concluding that *Younger* requires abstention in this case, the district court simply applied *Younger* to the entire SEP without verifying that the enforcement of each provision would interfere with state court proceedings. A provision-by-provision *Younger* analysis appears prudent, however, for the fact that one provision may not be enforceable in light of *Younger* does not necessarily warrant voiding the entire consent decree (*see* SEP at 9–10 (providing that State is relieved from performing particular provision if that performance is rendered impossible)), or dismissing the entire action. *Cf. Doran v. Salem Inn, Inc.,* 422 U.S. 922, 930–31, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (dismissing claims of one plaintiff pursuant to *Younger,* but allowing co-plaintiffs' claims to proceed because they did not pose risk of interference with ongoing state court proceedings); *Ballard v. Wilson,* 856 F.2d 1568, 1571–72 (5th Cir.1988) (dismissing claims for injunctive relief pursuant to *Younger,* but allowing claim for monetary damages where such claim was not cognizable in state court proceedings). Some of the SEP's provisions may be characterized as stand-alone provisions, amenable to enforcement independent of the more problematic provisions.

*Id.* at 1272–73. The court thus remanded the case, but offered some "preliminary observations" for the lower court's guidance:

> Enforcement of the provisions governing training of social workers (SEP at 2–3), the development of a computerized management information system (SEP at 7), and qualifications for social workers (SEP at 7–8) do not appear to risk interference with state court proceedings. As discussed above, the provisions governing assessment and treatment planning conferences present a stronger risk of running afoul of *Younger.* Also, federal enforcement of the provision

---

21. *See 31 Foster Children,* 329 F.3d at 1276–79 & n. 11 (explaining that the court must consider the relief requested by plaintiffs and then ask what kind of realistic effect such relief would have on the state-court proceedings).

calling for the use of state-created Citizen Review Boards may be problematic. Under state law, the Board reviews the disposition of children in the Department's custody prior to judicial review. The Board then submits a report to the Children's Court, which becomes part of the child's permanent court record. *See* NM ST §§ 32A–8–5, 32A–8–6. In making the Citizen's Review Board proceedings enforceable by a federal district court, the SEP asks the federal court to review the operation of a mechanism that is an essential part of the state court proceedings. This certainly suggests a risk of improper interference with state proceedings under *Younger. See DeSanti,* 653 F.2d at 1085–86 (applying *Younger* abstention where plaintiff sought to enjoin probation officers' practice of preparing "social histories" of juvenile defendants because the juvenile court's use of the histories "is an integral part of [its] handling of cases"). Many of the remainder of the SEP's provisions appear to be procedural, setting forth the means by which the State can exit the decree's requirements, and it is not obvious, at least on the record before us, that they would pose *Younger* problems.

*Id.* at 1273.

In a similar case, *Kenny A. ex rel. Winn v. Perdue,* 218 F.R.D. 277 (N.D.Ga.2003), the court concluded that the relief the plaintiffs had requested would not interfere with ongoing juvenile court proceedings, observing that

> [a]lthough plaintiffs all have periodic reviews before the state juvenile courts, the declaratory and injunctive relief plaintiffs seek is not directed at their review hearings, or at Georgia's juvenile courts, juvenile court judges, or juvenile court personnel. Rather, plaintiffs seek relief directed solely at executive branch

defendants to remedy their alleged failures as plaintiffs' custodians.

*Id.* at 286. The court continued, stating,

> As set out in the complaint, these alleged failures include (1) assigning excessive numbers of cases to inadequately trained and poorly supervised caseworkers; (2) not developing a sufficient number of foster homes properly screened to ensure the plaintiff children's safety; (3) not identifying adult relatives who could care for the plaintiff children as an alternative to strangers or impersonal institutions; (4) failing to provide relevant information and support services to foster parents in order to prevent foster placements from being disrupted; (5) failing to develop administrative controls such as an information management system that ensures plaintiff children are expeditiously placed in a foster home matched to meet the children's specific needs; (6) failing to provide timely and appropriate permanency planning, including failing to provide services that would enable plaintiffs to achieve their permanency planning goals; (7) placing plaintiffs in dangerous, unsanitary, inappropriate shelters and other placements; (8) failing to provide appropriate and necessary mental health, medical, and education services to children in their custody; and (9) separating teenage mothers in foster care from their own children and separating siblings in foster care from each other without providing visitation. (Compl. ¶¶ 39–97.)

*Id.* The court concluded:

> If these claims are proven, an order by this Court remedying such failures would not interfere in any way with ongoing juvenile court proceedings. To the contrary, the relief sought by plaintiffs would at most simply support and further the juvenile court's own mission of ensuring that children removed from

their parents' custody because of abuse or neglect are not further harmed when the juvenile court orders them into the custody of the state.[22]

Thus, for example, plaintiffs seek relief to ensure that caseloads are reduced to a reasonable level. The only conceivable effect on state court proceedings that could flow from such relief would be caseworkers appearing in juvenile court who are better prepared because they have reasonable caseloads. Likewise, plaintiffs seek to ensure that State Defendants develop an adequate and reliable computer database. Far from interfering with juvenile court proceedings, such relief would actually enable the juvenile court to do its job better by providing it with more accurate and complete information about the children whose lives may be profoundly affected by its decisions.

*Id.*

In *Kenny A.*, as here, the precise relief sought by plaintiffs was "somewhat unclear" to the court, for while the plaintiffs had sought a declaratory judgment and a permanent injunction enforcing "a long list of alleged constitutional and statutory rights," they had "not specified the precise contours of such relief." *Id.* at 286 n. 5. At the same time, in requesting abstention, the defendants had not attempted "to identify specific remedies that would interfere with state court proceedings," and instead contended broadly that " 'any injunctive relief that addresses Plaintiffs' claims would necessarily interfere with these deprivation proceedings.' " *Id.* The court noted that "the lack of specificity in both plaintiffs' prayer for relief limited the

court's analysis to the general nature of the relief sought." Nevertheless, the court "[was] confident that, if plaintiffs prevail[ed] on their claims, specific relief [could] be crafted that will not interfere with state court proceedings." *Id.*

This court does recognize that the interference at which *Younger* is aimed need not be direct, but rather may be indirect interference. *See Joseph A.*, 275 F.3d at 1271 ("[F]ederal court oversight of state court operations, even if not framed as direct review of state court judgements, may nevertheless be problematic for *Younger* purposes."). In the case at bar, the court still would be hard-pressed to conclude that any specific relief plaintiffs seek in this action would necessarily interfere with ongoing youth court proceedings. Or stated another way, it is not apparent that *all* the relief plaintiffs might request would interfere, either directly or indirectly, with ongoing youth court proceedings. Accordingly, the court will deny defendants' request for *Younger* abstention.

*Conclusion*

Based on the foregoing, it is ordered that defendants' motion to dismiss is granted in part and denied in part as set forth herein.

---

**22.** In *Kenny A.*, the court thought it "important to note that under Georgia law, once the juvenile court grants legal custody of a child to DFCS, the court is powerless to order DFCS to give physical custody of the child to any particular foster parent or otherwise restrict the actual placement of the child." 218 F.R.D. at 286 n. 6. The extent of Mississippi's youth courts in this same regard is not clear to this court from its review of the statutes.