**NEW YORK STATE CITIZENS' COALITION FOR CHILDREN,**
Plaintiff,

v.

**Gladys CARRION, Commissioner of the New York State Office of Children & Family Services, in her official capacity, Defendant.**

**No. 10–CV–3485 (WFK).**

United States District Court,
E.D. New York.

Signed July 17, 2014.

Grant Joseph Esposito, Adam James Hunt, Joel C. Haims, Leah Andrea Ramos, Paul Galante, Morrison & Foerster LLP, New York, NY, for Plaintiff.

John P. Gasior, Assistant Attorney General, Robert L. Kraft, State of New York, Office of the Attorney General, New York, NY, for Defendant.

### DECISION AND ORDER

WILLIAM F. KUNTZ, II, District Judge:

Plaintiff, a New York nonprofit organization, invites this Court to grant permanent injunctive relief fundamentally altering New York's system for setting foster care maintenance rates. Ruling on Defendant's Motion to Dismiss, the Court declines Plaintiff's invitation and holds that 42 U.S.C. §§ 672(a) and 674(5)(A), provisions of the Adoption Assistance and Child Welfare Act of 1980, do not provide a private right of action under 42 U.S.C. § 1983. The Supreme Court's instructions

in *Gonzaga Univ. v. Doe,* 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002), expounding on its previous ruling in *Blessing v. Freestone,* 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), make clear that these provisions lack the requisite "rights-creating language" and individual focus necessary to infer that Congress intended a private right of action. The Court shares the view of the District of New Jersey that "[i]t would be the height of federal judicial arrogance for this Court to supplant the efforts of [the state's] legislative, executive, and judicial branches with respect to the everyday functioning of the child welfare system in the broad, over-reaching way suggested by Plaintiff[ ]." *Charlie H. v. Whitman,* 83 F.Supp.2d 476, 514 (D.N.J.2000) (Brown, J.). For these reasons, the Complaint is dismissed in its entirety.

## FACTUAL AND PROCEDURAL BACKGROUND

"Preliminary to discussing the particular facts giving rise to this case, [the Court] review[s] the statutory scheme at issue." *New York ex rel. New York State Office of Children & Family Servs. v. U.S. Dep't of Health & Human Servs.,* 556 F.3d 90, 92 (2d Cir.2009).

### I. THE CHILD WELFARE ACT

In 1980, Congress passed the Adoption Assistance and Child Welfare Act (hereinafter "CWA"), 42 U.S.C. §§ 620 *et seq.,* 670 *et seq.* The statute was passed pursuant to Congress's authority under the federal Constitution's Spending Clause. U.S. Const. art. I, § 8. The CWA set guidelines for a cooperative state-federal program to provide federal funding for foster care and adoption assistance.

The CWA establishes the scheme by which the federal government reimburses compliant states for a portion of the payments that the states make to individuals and entities in their foster care and adoption assistance programs. *See New York ex rel. New York State Office of Children & Family Servs.,* 556 F.3d at 93. In order for a state to receive its matching federal funding, the state must comply with certain eligibility standards and constraints set forth in the CWA. *See* 42 U.S.C. § 670 (stating that the purpose of the CWA is to provide foster care assistance funds for states with compliant plans). As a precondition to receiving federal funding, each state is required to submit a "State plan" to the Secretary of the Department of Health and Human Services ("HHS") for approval. *See id.;* § 671(a) ("In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary [of HHS]."). HHS's Administration for Children & Families ("ACF") administers the CWA and supervises the states' plans. *See* 45 C.F.R. § 1355.31–37.

Congress delegated many aspects of CWA oversight to the states, including the creation of state authorities responsible for maintaining foster care standards, state administrative review opportunities, and mandatory, periodic state review of disbursements. 42 U.S.C. § 671(a)(10–12). Nonetheless, HHS maintains ultimate control of the federal funding faucet. Congress mandated that the Secretary of HHS promulgate regulations to ensure each state is in "substantial conformity" with federal statutory requirements, HHS regulations, and the state's own written plan. *See* § 1320a–2a(a). A state that fails to substantially conform with federal requirements is subject to mandatory corrective measures by HHS and ACF, including the withholding of federal funding. § 1320a–2a(b)(4). However, prior to withholding any federal funds, the Secretary is required to "afford the State an opportunity to adopt and implement a corrective action

plan." § 1320a–2a(b)(4)(A), (C). Accordingly, the CWA envisions a scenario in which a state that has failed to substantially conform—with federal statutory requirements, HHS regulations, or its own written plan—still receives federal matching funds while corrective plans are in effect. *See* § 1320a–2a(b)(4)(C).

There are thirty-three conditions that must be included in a state's plan in order to qualify for federal funding. § 671(a). The first requirement is that each state plan must "provide for foster care maintenance payments in accordance with section 672." § 671(a)(1). Foster care maintenance payments are defined as:

> payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement.[1]

§ 675(4)(A). In sum, a foster care maintenance payment is a state payment to a caretaker to cover the costs of the foster child's daily life.

Turning to § 672, Congress instructs that "each state ... shall make foster care maintenance payments on behalf of each child who has been removed from the home of a relative" so long as certain requirements are met. § 672(a)(1)(A), (B). The payments "may be made ... only on behalf of a child" who is eligible under § 672(a) and is in either "the foster family home of an individual ... or in a child-care institution." § 672(b). States only receive federal matching funds for foster care

maintenance payments that meet § 672's dictates. *See* § 674(a)(1).

## II. THE PARTIES

Before the Court is a Complaint by Plaintiff, the New York State Citizens' Coalition for Children, a nonprofit organization that "represents the interests of foster parents who provide care and supervision for children in foster care." Dkt. 1 ("Compl.") ¶ 1. The Coalition's members include more than twenty individuals and more than twenty-five groups and agencies, which purport to represent almost 400 foster parents. *Id.* ¶ 2. Plaintiff brings two causes of action for declaratory and permanent injunctive relief against Defendant Gladys Carrion, Commissioner of the New York Office of Children & Family Services, in her official capacity. *Id.* ¶¶ 40–45. Plaintiff alleges that New York has failed to comply with the dictates of the CWA by accepting federal funding while reimbursing foster care providers with only a fraction of the funds required by federal law. *Id.* at ¶¶ 24–39. Invoking a purported private right of action under § 1983, Plaintiff seeks to prevent New York from continuing its alleged violation of the CWA and to ensure foster parents are reimbursed by New York, with both state and federal funds, in compliance with the CWA. *See id.*

## III. PROCEDURAL HISTORY

Plaintiff filed its Complaint in the United States District Court for the Eastern District of New York on July 29, 2010. The case was reassigned from the Hon. Dora L. Irizarry to this Court on October 17, 2011. Dkt. Entry of 10/17/2011. After a July 25, 2012 pre-motion conference, the parties were given leave to file dueling

---

1. "In the case of institutional care, [foster care maintenance payments] include the reasonable costs of administration and operation of such institution as are necessarily required to provide the items described in the preceding sentence." 42 U.S.C. § 675(4)(A).

motions. Dkt. Entry of 7/25/12. Plaintiff filed a motion for summary judgment and the Defendant filed the motion to dismiss currently pending before the Court. On October 5, 2012, both motions were fully briefed and submitted to the Court. Dkts. 45–46.

Defendant's motion contends that Plaintiff has not established subject matter jurisdiction because there is no private right of action under 42 U.S.C. §§ 672(a), 675(4)(A) of the CWA. Dkt. 45–1 ("Def.'s Br.") at 10–14. Therefore, before its summary judgment may be adjudicated, Plaintiff faces the initial hurdle of establishing whether Congress permitted a § 1983 private right of action for the statutes at issue. That question turns us to the merits of Defendant's motion to dismiss.

## STANDARD OF REVIEW

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000) (citing Fed. R.Civ.P. 12(b)(1)); *see also Morrison v. Nat'l Austl. Bank Ltd.,* 547 F.3d 167, 170 (2d Cir.2008) ("Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."), *aff'd,* 561 U.S. 247, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010); *Henry v. Concord Limousine, Inc.,* 13–CV–0494, 2014 WL 297303, at *3 (E.D.N.Y. Jan. 24, 2014) (Seybert, J.). "[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Shipping*

*Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). The party asserting subject matter jurisdiction has the burden of proving its existence by a preponderance of the evidence. *Makarova,* 201 F.3d at 113. In determining whether subject matter jurisdiction exists, courts are permitted to look to materials outside the pleadings. *See Kamen v. Am. Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986) ("[W]hen . . . subject matter jurisdiction is challenged under Rule 12(b)(1), evidentiary matter may be presented by affidavit or otherwise."). When a plaintiff asserts a cause of action under a statute which contains no private right of action, the Court shall dismiss the claim for want of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1). *See Daniels v. Murphy,* No. 06–CV–5841, 2007 WL 1965303, at *2 n. 4 (E.D.N.Y. July 2, 2007) (Bianco, J.).

## ANALYSIS

The question posited to this Court is whether a private right of action under § 1983 arises from § 672(a) or § 675(4)(a). In a recent and persuasive decision, the United States Court of Appeals for the Eighth Circuit addressed the very same question, and answered in the negative. *Midwest Foster Care & Adoption Ass'n v. Kincade,* 712 F.3d 1190, 1194 (8th Cir. 2013).[2] This Court agrees and similarly holds that there is no private right of action under either statute. However, this ruling is a narrow one. The Court declines to hold that Congress has expressly foreclosed any private right of action against a state actor under the CWA, save for one explicit congressional carve-out for victims of discrimination in the foster care system. *See* 42 U.S.C. § 671(a)(18).

**2.** The United States Court of Appeals for the Second Circuit has not considered this ques-

tion and the Court reviews the issue as an open question within the Circuit.

The seminal case for determining whether a private right of action lies under § 1983 is *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), which provided a namesake three-factor test: 1) Congress must have intended that the provision benefit the plaintiff; 2) the right must not be so vague and amorphous that its enforcement would strain judicial competence; and 3) the statute must unambiguously impose a binding obligation on the states. *Id.* at 340–41, 117 S.Ct. 1353. The Supreme Court's decision in *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002), resolved the confusion over the first inquiry under the *Blessing* test. The *Gonzaga* Court "reject[ed] the notion that [its earlier] cases permit anything short of an unambiguously conferred right" can imply a cause of action under § 1983. 536 U.S. at 283, 122 S.Ct. 2268. Here, the two statutory sections Plaintiff alleges provide it with a private right of action fall far short of granting an "unambiguously conferred right." *Id.* Because Plaintiff is unable to sue a state under § 1983 actor for allegedly violating §§ 672, 675(4)(A), this Court lacks the subject matter jurisdiction to consider Plaintiff's claim, and the Complaint must be dismissed.

## I. Congress May Have Precluded Any Additional Private Causes of Action Under the CWA

Before addressing the *Blessing* factors, the Court considers Defendant's argument that when Congress passed the "Removal of Barriers to Interethnic Adoption" amendment in 1996 (42 U.S.C. § 674(d)(3)(A), hereinafter "Removal of Barriers Amendment"), its express creation of a cause of action for certain violations of the CWA evinced an intent to preclude a private right of action under any other section of the statute. While Defendant's position is persuasive, the

Court declines to adopt this broad argument.

■■■ "[U]nless Congress speaks with a clear voice, and manifests an unambiguous intent to confer individual rights, federal funding provisions provide no basis for private enforcement by § 1983." *Gonzaga*, 536 U.S. at 280, 122 S.Ct. 2268 (internal quotations omitted). When Congress expressly forecloses a remedy under § 1983, no further analysis is required to find that a plaintiff is not entitled to bring suit. *See Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 19–21, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) ("[T]he existence of [ ] express remedies demonstrates not only that Congress intended to foreclose implied private actions but also that it intended to supplant any remedy that otherwise would be available under § 1983."); *see also Smith v. Robinson*, 468 U.S. 992, 1005 n. 9, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984) (finding that a § 1983 private right of action will not lie where "Congress specifically foreclosed a remedy under § 1983"), *superseded by statute on other grounds, as recognized in Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 235, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). "Because [the] inquiry focuses on congressional intent, dismissal is proper if Congress 'specifically foreclosed a remedy under § 1983.'" *Blessing*, 520 U.S. at 341, 117 S.Ct. 1353 (quoting *Smith*, 468 U.S. at 1005 n. 9, 104 S.Ct. 3457). "Congress may do so expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* (quoting *Livadas v. Bradshaw*, 512 U.S. 107, 133, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994)).

Defendant's argument centers on the 1996 Removal of Barriers Amendment,

§ 674(d)(3)(A), which prohibits states receiving federal foster care funds from selecting foster parents or denying the placement of a child on the basis of race, color, or national origin. Defendant points out that Congress has passed no other provision allowing for a private cause of action under the CWA. Defendant also emphasizes that the 1996 Removal of Barriers Amendment was passed two years after the "*Suter* Fix." In the 1994 *Suter* Fix, Congress rejected the Supreme Court's 1992 ruling in *Suter v. Artist M.*, and established that a statute's state plan requirement could not alone preclude private enforcement of that statute. *See* 42 U.S.C. § 1320a–2; *cf. Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). However, the *Suter* fix did not "limit or expand the grounds for determining the availability of private actions to enforce State plan requirements" and did not disturb the *Suter* Court's holding that § 671(a)(15) of the CWA was not privately enforceable. § 1320a–2. Read together and chronologically, the Defendant argues that the statutes are "evidence that Congress decided that a limit on private rights of action under the CWA was appropriate." Dkt. 45–8 ("Def.'s Reply Br.") at 2.

Defendant's position finds some support in the caselaw. Other post-*Suter* Fix district court decisions have read the Removal of Barriers Amendment as "strong evidence that Congress did not intend these other various State plan elements in 42 U.S.C. § 671(a) to confer rights enforceable pursuant to § 1983." *Charlie H.*, 83 F.Supp.2d at 489; *see also Daniel H. ex rel. Hardaway H. v. City of New York*, 115 F.Supp.2d 423, 428 (S.D.N.Y.2000) (Marrero, J.); *Daniels*, 2007 WL 1965303, at *2 n. 4. Moreover, in considering the related question of implied rights of action under a different statute, the Second Circuit has found that the principle of *unis est exclusion alterius* is particularly persuasive

when considering the existence of an implicit causes of action. *Olmsted v. Pruco Life Ins. Co. of N.J.*, 283 F.3d 429, 433 (2d Cir.2002) (holding there was no implied right of action under §§ 26(f), 27(i) of the Investment Company Act of 1940). The Circuit explained that "Congress's explicit provision of a private right of action to enforce one section of a statute suggests that omission of an explicit private right to enforce other sections was intentional." *Id.* "Obviously ... when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 572, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *see also Olmsted*, 283 F.3d at 433.

Despite these persuasive points, the Supreme Court has instructed that federal courts "do not lightly conclude that Congress intended to preclude reliance on § 1983 as remedy." *Wright v. City of Roanoke Redevelopment and Housing Auth.*, 479 U.S. 418, 423–24, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987). Furthermore, there is no need for this Court to make such a broad holding when the *Blessing* test, read in light of *Gonzaga's* guidance, makes clear that there is no private right of action under § 1983 for the sections of the CWA involved in this litigation.

## II. THE *BLESSING* TEST AND *GONZAGA* FACTORS MAKE CLEAR THAT THERE IS NO PRIVATE RIGHT OF ACTION UNDER 42 U.S.C. §§ 672(A), 675(4)(A)

In *Blessing*, the Supreme Court held that "[i]n order to seek redress through § 1983 ... a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*." *Blessing*, 520 U.S. at 340, 117 S.Ct. 1353. To ascertain whether "a particular statutory provision gives rise to a federal right," the *Blessing* decision articulated a three-factor test:

First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Blessing,* 520 U.S. at 340–41, 117 S.Ct. 1353 (internal citations omitted); *see also Wachovia Bank, N.A. v. Burke,* 414 F.3d 305, 321–22 (2d Cir.2005). The Second Circuit has cautioned against applying these factors too strictly, explaining that: "courts should not find a federal right based on a rigid or superficial application of the *Blessing* factors where other considerations show that Congress did not intend to create federal rights actionable under § 1983." *Torraco v. Port Auth. of New York & New Jersey,* 615 F.3d 129, 136 (2d Cir.2010); *Wachovia Bank, N.A.,* 414 F.3d at 322.

In *Gonzaga,* the Supreme Court recognized that "[s]ome language in our opinions might be read to suggest that something less than an unambiguously conferred right is enforceable by § 1983." 536 U.S. at 283, 122 S.Ct. 2268. The resulting "confusion [had] led some courts to interpret *Blessing* as allowing plaintiffs to enforce a statute under § 1983 so long as the plaintiff [fell] within the general zone of interest that the statute [was] intended to protect." *Id.* The Court rejected the notion that "anything short of an unambiguously conferred right ... support[ed] a cause of action brought under § 1983." *Id.* ("[I]t is *rights,* not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of that sec-

tion."). Thus, *Gonzaga* invoked important aspects of our federalist system and established "that if a state is to be subject to private suits whenever it fails to meet a funding condition, Congress should clearly put the state on notice." *Midwest Foster Care,* 712 F.3d at 1196 (citing *Gonzaga,* 536 U.S. at 286 & n. 5, 122 S.Ct. 2268).

The *Gonzaga* Court also fleshed out three factors for courts to utilize when interpreting the first prong of *Blessing*— whether Congress intended for the statute to benefit the plaintiff. First, the *Gonzaga* Court reviewed whether Congress included "rights-creating language" in the statute. 536 U.S. at 285–86, 290, 122 S.Ct. 2268; *see Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury,* 445 F.3d 136, 149 (2d Cir.2006) (Sotomayor, Cir. J.). Second, the *Gonzaga* Court considered whether the contested statutory language manifested an aggregate focus, rather than being concerned with whether the needs of any particular person had been satisfied. *Gonzaga,* 536 U.S. at 287, 122 S.Ct. 2268; *see Midwest Foster Care,* 712 F.3d at 1196. Lastly, the Court considered the availability of a congressionally mandated federal review mechanism. *Gonzaga,* 536 U.S. at 289–90, 122 S.Ct. 2268; *see Midwest Foster Care,* 712 F.3d at 1197. Also important to the determination in *Gonzaga* was that the statute "was spending legislation that focused primarily on the government's allocation of resources." *Loyal Tire & Auto Ctr.,* 445 F.3d at 149 (citing *Gonzaga,* 536 U.S. at 290, 122 S.Ct. 2268). "In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Pennhurst State School &*

*Hospital v. Halderman,* 451 U.S. 1, 28, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).

Thus, the requisite analysis begins with an examination of §§ 672, 675(4)(A) in light of these principles from *Blessing* and *Gonzaga.*

### A. 42 U.S.C. §§ 672, 675(4)(A) Lack "Rights–Creating Language"

■■■ The first factor for interpreting the first prong of the *Blessing* test looks at whether the text and structure of the statute indicate that Congress used "rights-creating language" in conferring the benefit on the plaintiff. *See Loyal Tire & Auto Ctr.,* 445 F.3d at 149; *see also Gonzaga,* 536 U.S. at 285–86, 290, 122 S.Ct. 2268. " 'Statutes that focus on the person regulated rather than the individuals protected' do not tend to create enforceable rights." *Midwest Foster Care,* 712 F.3d at 1197 (quoting *Gonzaga,* 536 U.S. at 287, 122 S.Ct. 2268). The text and structure of §§ 672, 675(4)(A) lack any indicia of "rights-creating language" and suggest that Congress did not intend for an individual cause of action to arise from the statute. The sections "speak to the states as regulated participants in the CWA and enumerate limitations on when the states' expenditures will be matched with federal dollars; they do not speak directly to the interests of the [foster care] Providers." *Id.*

To begin with, § 675(4)(A) provides the definition of "foster care maintenance payments," fittingly, in the CWA's definitional section. To infer a private right of action from a definitional section is antithetical to the mandate that a private right in a federal statute does not exist "unless Congress speaks with a clear voice and mandates an unambiguous intent to confer individual rights." *Midwest Foster Care,* 712 F.3d at 1197 (quoting *Gonzaga,* 536 U.S. at 280, 122 S.Ct. 2268). Other courts have

confirmed this principle and refused to infer a private right of action under § 1983 from a purely definitional section. *See id.*; *31 Foster Children v. Bush,* 329 F.3d 1255, 1271 (11th Cir.2003) (statutory sections that "are definitional in nature ... alone cannot and do not supply a basis for conferring rights enforceable under § 1983"); *Crawford v. Wash. Cnty. Children and Youth Services,* 06–CV–1698, 2008 WL 239454, at *6 n. 1 (W.D.Pa. Jan. 29, 2008) (same); *Olivia Y. ex rel. Johnson v. Barbour,* 351 F.Supp.2d 543, 561 (S.D.Miss.2004) (same); *Charlie H.,* 83 F.Supp.2d at 490 (finding a provision in the definitional subsection of the CWA, standing alone, does not "confer[ ] a right upon Plaintiffs enforceable pursuant to § 1983"); *B.H. v. Johnson,* 715 F.Supp. 1387, 1401 (N.D.Ill.1989) ("It would be strange for Congress to create rights enforcing language in the definitional section of a statute."). Section 675(4)(A) simply limits the costs that the federal government will provide matching funds for by including an itemized list of permissible expenditures. The section puts states on notice as to what foster care-related expenditures will be reimbursed and gives no inference of an intent to provide a private right of action. *See Midwest Foster Care,* 712 F.3d at 1197–98. ("Section 675(4)(A) is part of an open-ended entitlement program, and when viewed in this context, it seems natural that Congress would choose to place limitations on the type of state expenditures it matches."). The language "more closely resembles an affirmative obligation on the state than a creation of an individual right." *Midwest Foster Care & Adoption Assoc. v. Kinkade,* 11–CV–1152 (D.Mo. Mar. 9, 2012) (unpublished), *aff'd,* 712 F.3d at 1194.

Beyond the CWA's definitional section, § 672(a) provides that "[e]ach state ... shall make foster care maintenance pay-

ments on behalf of each child who has been removed from the home of a relative" and then sets forth a list of scenarios in which such payments are not required. This requirement, as would be expected from a spending clause provision, focuses on how and when a state will act in order to qualify for federal funding. *See Pennhurst*, 451 U.S. at 28, 101 S.Ct. 1531. The funding recipients' benefit (i.e. the money given to foster parents) is ancillary to the entities the statute is focused on: the states. "[T]he overwhelming focus is upon the conditions precedent that trigger the [federal government's] obligation [to reimburse]." *Midwest Foster Care*, 712 F.3d at 1198 ("The function of § 672(a) is to serve as a roadmap for the conditions a state must fulfill in order for its expenditure to be eligible for federal matching funds; otherwise, the state bears the full cost of these payments."). The key actor in § 672(a) is the state, and the operative condition consists of prerequisites that must be met for the federal government to reimburse the state. In sum, § 672(a) is focused on what a state must do to be eligible for federal funding. In these circumstances, the attention is not "individually focused" and does not suggest an unambiguous intent to allow a private right of action. *Gonzaga*, 536 U.S. at 287, 122 S.Ct. 2268; *see also Midwest Foster Care*, 712 F.3d at 1198–99.

If the statute were worded differently, and § 672(a)(1) read: "No eligible child shall be denied foster care maintenance payments by a State with an approved plan," a reasonable reader might find the requisite "rights-creating" language. (*See* Def.'s Br. at 20). Indeed, the post-*Gonzaga* cases that have found rights-creating language, have included similar text. *Cf. Torraco*, 615 F.3d at 136–37 (finding rights-creating language in 18 U.S.C. § 926A, which "entitles" non-prohibited persons to transport firearms for any lawful purpose from one place where they may lawfully have firearms to another).[3] However, that language is not present within § 672, which is instead constructed to focus on the states' responsibilities under the statute. Clearly, Congress knew how to draft unambiguous rights-creating language in the wake of *Blessing* and *Gonzaga* if that was its desire. *See Olmsted*, 283 F.3d at 433 ("Congress's explicit provision of a private right of action to enforce one section of a statute suggests that omission of an explicit private right to enforce other sections was intentional."); *see also Touche Ross*, 442 U.S. at 572, 99 S.Ct. 2479 ("when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly"). For example, in *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), where the Court did find a private right of action in the Medicaid Act, "the relevant provisions ... did not focus on defining the conditions that must be met in order for a participating state's expenditures to be eligible for federal matching funds and, therefore, did not evince the degree of

**3.** The full statutory provision at issue in *Torraco* read: "Notwithstanding any other provision of any law or any rule or regulation of a State or any political subdivision thereof, any person who is not otherwise prohibited by this chapter [18 U.S.C. § 921 et seq.] from transporting, shipping, or receiving a firearm shall be entitled to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm if, during such transportation the firearm is unloaded, and neither the firearm nor any ammunition being transported is readily accessible or is directly accessible from the passenger compartment of such transporting vehicle: *Provided,* That in the case of a vehicle without a compartment separate from the driver's compartment the firearm or ammunition shall be contained in a locked container other than the glove compartment or console." 18 U.S.C. § 926A.

removal [the Court] now confront[s]" in reviewing § 672(a). *Midwest Foster Care,* 712 F.3d at 1199. Because the sections of the CWA before the Court plainly turn on whether a state is in compliance with federal requirements, there is no textual basis for finding a private right of action.

The courts that have reached the contrary conclusion have hinged their decisions on the mere inclusion of foster parents as the recipients of § 672(a)'s funding mandate. *See, e.g., Cal. State Foster Parent Ass'n v. Wagner,* 624 F.3d 974, 981–82 (9th Cir.2010); *see also Midwest Foster Care,* 712 F.3d at 1203 n. 10 (Smith, J. dissenting) (citing cases). This Court joins the *Midwest Foster Care* court in highlighting the actual consequence of § 672(a)'s reference to foster · parents. "The ability to locate a nexus between § 1983 plaintiffs and a benefit conferred by a statute is necessary but not sufficient; the statutory text also must be phrased in terms of the persons benefitted." *Midwest Foster Care,* 712 F.3d at 1199 (quoting *Gonzaga,* 536 U.S. at 284, 122 S.Ct. 2268) (internal quotations omitted). This ensures that § 1983 only provides a cause of action for federal *rights* and not any federal *law. See Blessing,* 520 U.S. at 340, 117 S.Ct. 1353.

A plaintiff's mere status as a beneficiary of a federal law is insufficient to stake a claim to a congressional grant of the right to privately enforce the statute . under § 1983. *See Gonzaga,* 536 U.S. at 283, 122 S.Ct. 2268. "For a statute to create private rights, its text must be phrased in terms of the persons benefited." *Gonzaga,* 536 U.S. at 274, 122 S.Ct. 2268. "Where the statutory language primarily concerns itself with commanding how states are to function within a federal program, the statute is less likely to have created an individually enforceable right." *Midwest Foster Care,* 712 F.3d at 1200.

And here, it is the states, not foster care providers, that are the textual focus of § 672(a). This is strong indication that Congress did not intend for foster care providers to have a private right of action under § 1983 for alleged violations by state actors of this section of the CWA.

### B. 42 U.S.C. §§ 672(a), 675(4)(A) Have an Aggregate, Not an Individual, Focus

The next factor in analyzing the *Blessing* test's first prong is determining whether the statutory provision in question has an aggregate or an individual focus. *Gonzaga,* 536 U.S. at 288, 122 S.Ct. 2268. If a statute has an aggregate focus, it "cannot give rise to individual rights." *Id.* (quoting *Blessing,* 520 U.S. at 344, 117 S.Ct. 1353) (internal quotations omitted). A court should review the "text and structure" of the statutory provisions to discern their focus. *Id.* at 286, 122 S.Ct. 2268. As the text and structure of §§ 672(a), 675(4)(A) do not emphasize "whether the needs of any particular [foster care provider] have been satisfied," these sections lack an aggregate focus and do not give rise to an individual right. *Id.* at 288, 122 S.Ct. 2268 (quoting *Blessing,* 520 U.S. at 343, 117 S.Ct. 1353); *see also Midwest Foster Care,* 712 F.3d at 1200.

That a state need only be in "substantial conformity" with the CWA's requirements to receive federal funding strongly suggests that the statute has an aggregate focus. *Gonzaga,* 536 U.S. at 288, 122 S.Ct. 2268 (finding a statute that allowed institutions to avoid termination of federal funding so long as they "compl[ied] substantially" with the statute's requirements had an aggregate focus); *Blessing,* 520 U.S. at 335, 117 S.Ct. 1353 (finding no private right of action under § 1983 in part because only "substantial compliance" with federal regulations was required); *see also*

*Midwest Foster Care*, 712 F.3d at 1200–01 (finding the substantial compliance component of the CWA supports the denial of a private right of action); *Olivia Y.*, 351 F.Supp.2d at 562 (same). Under the CWA, a state can continue to receive federal matching funds for foster care maintenance payments even though it has objectively failed to meet federal mandates. So long as a state is in "substantial conformity" with the statutory regime, the federal faucet continues to flow. *See* 42 U.S.C. § 1320a–2a. Only when a state is so far out-of-line with Congress's express dictates does a state even begin to face the threat of termination of federal funding. *See* §§ 1320a–2a(b)(4)(A), (C) (requiring the Secretary of HHS to "afford the State an opportunity to adopt and implement a corrective action plan" before withholding federal funding). Such "[a] substantial compliance regime cuts against an individually enforceable right because, even where a state substantially complies with its federal responsibilities, a sizeable minority of its beneficiaries may nonetheless fail to receive the full panoply of offered benefits." *Midwest Foster Care*, 712 F.3d at 1200–01. "Focusing on substantial compliance is tantamount to focusing on the aggregate practices of a state funding recipient." *Id.* at 1201; *see also Gonzaga*, 536 U.S. at 288, 122 S.Ct. 2268; *Blessing*, 520 U.S. at 335, 117 S.Ct. 1353; *Olivia Y.*, 351 F.Supp.2d at 562.

Of course, standing alone, a substantial compliance regime does not establish that a statute has an aggregate focus. *See Midwest Foster Care*, 712 F.3d at 1201 ("[W]hile a substantial compliance regime may suggest an absence of the requisite congressional intent, it cannot by itself

establish an aggregate focus"); *compare Wilder*, 496 U.S. at 512, 110 S.Ct. 2510 (1990) (holding a private right of action existed in a Medicaid statute providing for "reasonable and adequate" reimbursement rate despite a substantial compliance provision). Nonetheless, here, other factors also demonstrate that Congress had an aggregate focus in drafting the CWA. When the "reference to [the asserted individual right] is in the context of describing the type of [action] that triggers a funding prohibition[,]" an aggregate focus is evident. *Gonzaga*, 536 U.S. at 288–89, 122 S.Ct. 2268. In other words, when the statute couches the plaintiff's purported right in terms of what *state* actions will terminate federal funding, it is indicative of an aggregate focus.

*Gonzaga* offered a clear example of such an occurrence. The statute in *Gonzaga*, the Family Educational Rights and Privacy Act (FERPA), refused federal funds to educational institutions that had a policy or practice of releasing student records without parental consent.[4] *See Gonzaga*, 536 U.S. at 279, 122 S.Ct. 2268. "In each provision [of the FERPA] the reference to individual consent is in the context of describing the type of 'policy or practice' that triggers a funding prohibition ... [and] such provisions cannot make out the requisite congressional intent to confer individual rights enforceable by § 1983." *Id.* at 288–89, 122 S.Ct. 2268. At the same time, in instances where the Court has found an enforceable right, the statutory language did not turn on actions that would terminate federal funding. *Cf. Wilder*, 496 U.S. at 502–03, 110 S.Ct. 2510 (considering 42 U.S.C. § 1396a(a)(13)(A), which contains

---

4. The relevant section of the FERPA states: "No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein ...) of students without the written consent of their parents to any individual, agency, or organization." 20 U.S.C. § 1232g(b)(1).

no reference to the termination of federal funding if a health care provider does not comply with federal regulations); *Wright,* 479 U.S. at 420, 107 S.Ct. 766 (considering Pub.L. 97–35, § 322, 95 Stat. 400, which contains no reference to the termination of federal funding if a low-income family is required to pay rent higher than required under federal law). Comparing the Supreme Court's holdings in these cases, §§ 672(a), 675(4)(A) are more similar to "the statutory language at issue in *Gonzaga* than that of the statutes at issue in *Wilder* or *Wright* .... [i]n other words, the failure to meet the requirements of § 672(a) 'triggers a funding prohibition,' and the asserted right is only mentioned in the context of these funding prohibitions." *Midwest Foster Care,* 712 F.3d at 1201–02; *see also Olmsted,* 283 F.3d at 433 (quoting *Alexander v. Sandoval,* 532 U.S. 275, 289, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001)) ("Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons."). The text and structure of §§ 672(a), 675(4)(A) indicate that Congress drafted these sections of the CWA with an aggregate focus and without an intent to create an individually enforceable right.

The final indication that the CWA, generally, has an aggregate, as opposed to individual focus, is the statute's declaration of purpose. The declaration explicitly states that the CWA was enacted to designate appropriate funds "[f]or the purpose of enabling each State to provide, in appropriate cases, foster care and transitional independent living programs for [eligible] children." 42 U.S.C. § 670. In selecting this purpose, as opposed to one ensuring that no foster care provider is deprived of federal funds, the elected branches revealed that their concern was with "enabling [the] State[s]" to oversee the functioning of their foster care systems. Defendant argues that this is "a classic statement of legislation enacted pursuant to Congress's spending power, whereby Congress rewards certain state conduct and penalizes deviation from set criteria by administrative termination of funding." (Def.'s Br. at 22). The Court agrees and finds that a spending statute turning on state compliance does not create a private right of action under § 1983. *See Pennhurst,* 451 U.S. at 28, 101 S.Ct. 1531.

Plaintiff argues that this Court should adopt the contrary finding of the United States Court of Appeals for the Ninth Circuit. *See Wagner,* 624 F.3d at 980. That court found " § 672 of the CWA focuses squarely on the individuals protected, rather than the entities regulated. It does not purport to regulate state institutions." *Id.* at 980. The Ninth Circuit's decision turned on its finding that " § 672's reference to 'payments on behalf of *each* child' is individual, rather than aggregate." *Id.* This finding ignores the structure and language of the CWA. It is unsurprising that a piece of Spending Clause legislation will ultimately benefit some party. The crucial inquiry, however, is whether the congressional focus was on the "person regulated" (here, the states) and not the "individuals protected" (here, the foster care providers). *See Gonzaga,* 536 U.S. at 288, 122 S.Ct. 2268. As the CWA's funding regime turns on whether the state is in substantial conformity with federal requirements, rather than focusing on individual instances of noncompliance, its aggregate focus is without a doubt. *See id.* The Ninth Circuit in *Wagner* overvalued the reference to the individual beneficiaries and ignored the CWA's statutory design that centers on whether a state substantially conformed with federal requirements so that it may continue to receive matching funds. *Cf. Cal. v. Sierra*

*Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981) ("The question is not simply who would benefit from the Act, but whether Congress intended to confer federal rights upon those beneficiaries.").

Lastly, the Court notes that it is mindful of the *Suter* Fix in reaching its decision. *See* 42 U.S.C. § 1320a–2. In response to the Supreme Court's decision in *Suter v. Artist M,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992) (holding a provision of the CWA did not give right to private cause of action because of the statute's state plan requirement), Congress passed 42 U.S.C. § 1320a–2.[5] That provision instructed that the requirement of a state plan cannot, alone, serve as the basis for denying a private right of action. *See Rabin v. Wilson–Coker,* 362 F.3d 190, 202 (2d Cir.2004); *Boyland v. Wing,* 487 F.Supp.2d 161, 171 (E.D.N.Y.2007) (Bianco, J.). Here, it is not the mere existence of a state plan that compels a finding that no private right of action exists. Rather, it is the structure and text of §§ 672(a), 674(5)(A)—requiring only substantial conformity, placing the reference to the beneficiary within conditional language regarding the termination of federal funding, and the statute's stated purpose—that drive this Court's holding that the contested CWA sections have an aggregate focus.

### C. The Existence of a Federal Review Mechanism

The final factor *Gonzaga* introduced for clarifying the first prong of *Blessing* is the consideration of an aggrieved individual's access to a federal review mechanism. *Gonzaga,* 536 U.S. at 289–90, 122 S.Ct. 2268 (finding that access to a federal review mechanism "further counsel[s] against [ ] finding a congressional intent to create individually enforceable private rights"). The federal review mechanism in *Gonzaga* included express authorization for the Secretary of Education to "deal with violations" of the FERPA and a requirement that the Secretary "establish or designate [a] review board" for handling violations. *Id.* at 289, 122 S.Ct. 2268 (discussing 20 U.S.C. 1232g's review provisions and the creation of the Family Policy Compliance Office "to act as the Review Board required under the Act [and] to enforce the Act with respect to all applicable programs").

"In contrast, although the CWA 'provides for oversight and funding restrictions that may be imposed by the Secretary' on the participating states, there is no direct federal review of the claims of individual providers." *Midwest Foster Care,* 712 F.3d at 1202 (quoting *Mo. Child Care Ass'n v. Cross,* 294 F.3d 1034, 1038 (8th Cir.2002) (discussing the delegation of oversight to the states including: state administrative review opportunities for individuals whose benefits are denied and mandatory periodic state review of foster care maintenance payment amounts) (citing 42 U.S.C. §§ 671(a)(11), (12))). Meaningful federal review under the CWA is limited to mandatory HHS/ACF audits of state programs for substantial compliance

---

**5.** "In an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in *Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this section is not intended to alter the holding in *Suter v. Artist M.* that section 671(a)(15) of this title is not enforceable in a private right of action." 42 U.S.C.A. § 1320a–2.

with the individual state's plan and the statute's mandates. § 1320a–2a(b).[6]

However, the absence of a comparable federal mechanism is not fatal to Defendant's position. *Gonzaga* makes clear this factor is tertiary and supplemental to the inquiry with regard to the first two factors. *See* 536 U.S. at 289–90, 122 S.Ct. 2268. The finding of a federal review mechanism merely "buttressed" the *Gonzaga* Court's determination that Congress did not intend a private cause of action and only "*further* counsel[ed] against [the Court's] finding a congressional intent to create individually enforceable private rights." *Id.* (emphasis added). The Supreme Court's treatment of this third factor indicates that when the first two factors strongly weigh against the finding of a private right of action, the absence of a federal review mechanism will not revive a plaintiff's grasp at a § 1983 cause of action. *See Midwest Foster Care*, 712 F.3d at 1202 ("reject[ing] the notion that a failure to provide a federal enforcement mechanism equal to the one considered in *Gonzaga* is sufficient to overcome the weight of these competing considerations"). "Despite the relative lack of federal review opportunities ... the other elements of *Gonzaga's* analysis of *Blessing's*, first prong strongly tilt against the finding of an unambiguous intent to create an individually enforceable right." *Id.*

Furthermore, Defendant has advocated that the "[p]resence of a comprehensive federal enforcement scheme bolsters the conclusion that the CWA confers a benefit on Plaintiff but not a right." (Def.'s Br. at 23). Defendant highlights, and this Court takes note of, the extensive statutory scheme for helping wayward states return to "substantial conformity" and the ability for HHS to use its audit power to terminate federal funding. *See* § 1320a–2a(b). While the CWA clearly places the bulk of enforcement responsibility with the states and these measures certainly fall short of the federal mechanisms present in *Gonzaga*, there remains a recurring federal role, with powerful repercussions, in the distribution of foster care maintenance payments to the states. *See* § 1320a–2a.

Indeed, the scheme Congress devised for the operation of the CWA—state enforcement coupled with federal regulatory audits and the ability to terminate funding—involves a delicate balance between the institutional players in our federal system. Congress was mindful of the importance of sending federal money to state actors responsible for these particularly needy members of American society. Of note, and as discussed above, a state that falls out of substantial conformity will not immediately lose funding, but will be provided with HHS-set benchmarks to bring its foster care system back into compliance, all while continuing to receive federal funds. *See, e.g.,* 45 C.F.R. § 1355.35(a)(*l*)(v); *see also* 45 C.F.R. § 1355.32(d). To have individual plaintiffs intrude on this nuanced system would divest HHS of its congressionally-prescribed role in ensuring that states remain substantially compliant with the CWA's mandates. It is hard to imagine how a noncompliant state could simultaneously work through its HHS benchmarks and be sub-

---

**6.** "In general[:] The Secretary, in consultation with the State agencies administering the State programs under parts B and E of subchapter IV of this chapter, shall promulgate regulations for the review of such programs to determine whether such programs are in substantial conformity with—

(1) State plan requirements under such parts B and E,
(2) implementing regulations promulgated by the Secretary, and
(3) the relevant approved State plans." 42 U.S.C.A. § 1320a–2a.

ject to a federal court injunction of the nature sought by Plaintiff here. The resulting intrusion is a powerful indication that Congress did not envision § 1983 plaintiffs barging into its carefully crafted scheme. Plaintiff's untenable proposal reiterates what the Supreme Court has said about finding private rights of action in Spending Clause legislation: "the typical remedy for state noncompliance with federally-imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Pennhurst,* 451 U.S. at 28, 101 S.Ct. 1531.

In the absence of a "clear and unambiguous" congressional intent to provide a § 1983 cause of action to plaintiffs claiming that a state has failed to comply with §§ 672(a), 674(5)(A), there is no need to review the other *Blessing* factors. *See Gonzaga,* 536 U.S. at 290–91, 122 S.Ct. 2268; *Midwest Foster Care,* 712 F.3d at 1202. Accordingly, our inquiry ends after finding no indication that Congress intended to create a private right of action in these sections of the CWA.

## CONCLUSION

Defendant's motion to dismiss is GRANTED. The Complaint is DISMISSED in its entirety. Furthermore, this decision renders Plaintiff's motion for summary judgment moot. The Clerk of the Court is respectfully requested to close the case.

**SO ORDERED.**